NELSEN, Respondent, vs. FARMERS MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant: FARMERS MUTUAL SERVICES, Appellant.*

*April 7—May 6, 1958.*

* Motion for rehearing denied, with $25 costs, on June 26, 1958.

For the appellant there was a brief by *Aberg, Bell, Blake & Conrad* of Madison, and oral argument by *William J. P. Aberg* and *Edwin Conrad*.

For the respondent there was a brief by *Kaftan, Kaftan & Kaftan* of Green Bay, and oral argument by *J. Robert Kaftan* and *Fred F. Kaftan*.

MARTIN, C. J. From 1929 to early 1937 plaintiff, a resident of Wauwatosa, was circulation manager at Racine for a farm paper. From March, 1937, until February, 1938, he worked for a casualty insurance company, developing a farm department in that company and appointing agents throughout the state for the sale of health and accident insurance. At the suggestion of an acquaintance, a district supervisor for the Farmers Mutual Automobile Insurance Company (hereinafter referred to as the "Insurance Company"), he acquired a local agent's license and in September, 1937, the Insurance Company issued to him a certificate to sell its policies.

The Insurance Company was organized in 1927 in Madison, doing business only in Wisconsin, but as the years went by it was organized to do business in other states as well. Farmers Mutual Services (hereinafter referred to as "Services") was a stock company organized for the purpose of conducting a brokerage and insurance business and management of the agency business of the Insurance Company.

Originally, Mr. Herman Wittwer, Mr. August Rammer, Mr. Richard Kalbskopf, Mr. Wm. J. P. Aberg, and three others were directors of the Insurance Company. Mr. Kalbskopf was treasurer of the company from 1927 to 1944; Mr. Wittwer and Mr. Rammer have always been its secretary and president, respectively. Mr. Irving Maurer became treasurer of the company in 1944, succeeding Mr. Kalbskopf, and has acted in that capacity, as well as a director, since that time.

The three original stockholders, officers, and directors of Services were Mr. Wittwer, Mr. Kalbskopf, and Mr. Rammer. In 1944, when Kalbskopf left, Mr. Maurer became a stockholder, officer, and director of Services.

In the latter part of 1937 or early 1938 Mr. Kalbskopf and Mr. Maurer contacted the plaintiff Nelsen in an effort to recruit him as a district supervisor. The parties met for the first time in the Schroeder Hotel in Milwaukee, at which time, according to the testimony of Nelsen, Kalbskopf and Maurer showed him figures of the company's business in 1936, which were "real small," but they painted a glowing picture of Nelsen's opportunity to grow with a small company and have a business of his own. They said they were anxious to get district men; that he would be expected to build up the district on his own time, money, and effort, hiring and training agents in a certain territory (not then assigned), and also to conduct a local insurance agency of his own.

At a later meeting with Nelsen in Madison, Kalbskopf and Wittwer offered him work in the home office for a while to learn about the Insurance Company, further discussion of a supervisorship to be had when something opened up in the field. After a week or two Nelsen accepted the offer and worked at the home office until July 1, 1938. The testimony discloses that during the time Nelsen worked at the home office there were further discussions, most of them apparently with Kalbskopf, with respect to his becoming a district super-

visor. He was to be given a territory, mostly rural, in which there were then two part-time supervisors whom he would have to pay for their districts. He was to be permitted to operate both as a district supervisor and as a local agent. Development of the district would be at his own expense but it would be his business as long as the company continued to sell insurance in the territory. He would own the district sales force. He would be permitted to sell insurance in other companies because there were many types of insurance that the company did not write. At that time it was extremely difficult to sell assessable insurance such as the Insurance Company wrote. When Nelsen became a district supervisor the total volume of the company's business in Nelsen's district was around $18,975.

The agreement was oral. Nelsen was appointed district supervisor and an informal letter was sent him by Maurer on June 16, 1938, stating that his territory would be all of Waukesha county except certain specified townships and all of Milwaukee county except the cities of Milwaukee, West Allis, and Wauwatosa. The letter also stated that he was to assume his duties on July 1, 1938, and have a drawing account. During the first six months in his district the volume of business therefrom was $18,000, which represented overwriting commissions to him of $810 gross.

Nelsen further testified that with respect to his personal local agency the renewals and expirations of policies he sold were to be his own. It was recognized by the Insurance Company and Services that Nelsen would not make any money on his overwriting commissions from the district supervisorship for a number of years. He had to depend upon his selling for income; but once he had developed the supervisorship he would have the security of his own business as long as the company wrote insurance in his territory.

Mr. Kalbskopf testified that he regularly recruited district supervisors for Services from 1938 to 1944. The following

excerpts are taken (in abstracted form) from his testimony with respect to the agreement with Nelsen:

"It was a small company and a company which is assessable, it surely was an awful setback that we had—we had to go to appoint agents, especially general agents, to go out on their own expense and their own car expense and work, get up an organization. It took them years; it would take them years before they could make a living. That was the situation in 1938, we were a small company. We had to take that into consideration in the propositions we offered to the various district agents."

"If you have to go out to try to get a district man that year and say there is no salary connected with this here; here's a territory; we want you to go out and develop it; you pay your own expenses on here and develop this territory. That is a job. How do you expect anybody would go for that?"

"I told this to all district men that I appointed; here is a great opportunity here; sure it will take some of your money and lot of your time, but you will have something here after you get it built up for yourself. I told them they'd own their business. They would own the sales force. I told them it would be their own business; I told that to Mr. Nelsen."

"Absolutely, I was trying to get the best men. I was trying to get good men who had a good reputation in the community and had been reasonably successful in the past."

"I do not mean I could get good men without making promises. If I told a man he was just to have a job and spend his money, I guess I could not get them to work for an assessable company. I found that was true from my experience."

He further testified:

"*Q.* Mr. Kalbskopf, did you tell Mr. Nelson, as he testified, that he would have this business so long as the company operated in his district, if he built it up, whatever he built up? *A.* I don't know if that was exactly the words. . . . I told that to Mr. Nelsen in substance and I told other district supervisors the same thing. I had to tell them that."

"I told him he would own his own renewals and his own local agency. We told all district agents."

Kalbskopf further testified that he effected the appointment of one Ralph Williams of Kansas City as district supervisor in July of 1943, and, at Williams' insistence, he put the terms of the appointment in writing. The document, which was introduced in evidence, states that, "Following are the major conditions governing the appointment of all Farmers Mutual district supervisors . . ." and sets forth terms substantially similar to those testified to by Nelsen as constituting his oral agreement with Services. The document states, among other things, that the company will not appoint any other district supervisor in the territory outlined; that, in effect, the district supervisorship and the right to the overwriting commissions are the supervisor's own and may be transferred or sold by him. Kalbskopf testified that the terms set out therein were applicable to other district supervisors and were such representations as he had made to Nelsen, with perhaps some difference in phraseology.

Mr. Rammer testified that Kalbskopf had charge of the agency department while he was with Services; his work involved the recruiting of district supervisors; that Kalbskopf had authority to make any contract he could with district supervisors except that it had to meet with the approval of the other officers; that there was some dissatisfaction with Kalbskopf's activities in making representations to district supervisors, but there is no evidence that any agreements made by Kalbskopf with such supervisors were disapproved. Rammer testified that the only inducement Nelsen received to act as a district supervisor was the loan of some money and the overwriting contract; it was his understanding that Nelsen's contract could not be terminated except for cause.

Clarence Ihlenfeldt of Kewaunee started as district supervisor for the company in 1943. He testified he had been a

school principal and sold insurance on the side; that Mr. Kalbskopf asked him to work as a district supervisor but he was reluctant to accept the offer because he was building up his teachers' retirement and was interested in security. He was told that there would be more security for the future as a district supervisor; that if he was willing to invest money and hard work during the beginning years he would be able to succeed as Nelsen had. A meeting was arranged with Nelsen, at which Kalbskopf was present, and "Mr. Nelsen brought out pretty much the same story that Mr. Kalbskopf told me at Kewaunee;" that—

"Mr. Nelsen said, 'Clarence, I am sure you will be able to succeed as a district supervisor, if you are willing to work, you will build it up, better than the pension that you have,' which was the teachers' retirement fund. That was the thing I was mostly concerned about. He said, 'Clarence, you won't have to worry any about that. This insurance business grows much faster and much bigger. You will build a business of your own, the same as I am, and you will have security, if you are willing to work the first couple years and not make money.' "

Ihlenfeldt further testified that both Kalbskopf and Nelsen "assured me I would have a business of my own, a little company of my own and a pension for life."

When Nelsen started as district supervisor after July 1, 1938, there were two part-time supervisors in the territory assigned to him. He was required to pay them for their districts. He testified there were about eight or 10 agents in the territory. He sought out prospective agents, trained them, paid for advertising the name of Farmers Mutual, held meetings, supervised his agents, and paid all his expenses. He worked ten hours a day, usually seven days a week. During the first six months his total production was $18,000 premium volume, on which his overwriting commission was $810; his expenses were $335. By 1953 he had

68 agents in his district, produced over $450,000 premium volume (not including some $22,000 to $25,000 attributable to his own agency), on which his overwriting commission was $14,046; his expenses in 1953 were $4,653.

On August 23, 1944, the defendant Services (then called "Managers") sent a letter in mimeographed form to Nelsen advising that it "hereby appoints you as a district supervisor for the Farmers Mutual Automobile Insurance Company, effective as of July 1, 1944 . . . ;" outlining the territory; defining the duties and functions of district supervisor; requiring that Nelsen make the district supervisorship his principal business; providing that he bear all the expenses of carrying out his duties in such capacity; stating that overwriting commissions shall be 10 per cent on new business, 4 per cent on renewal business, and commissions on business as local agent the same as other local agents; and that—

"This appointment shall be continuous unless terminated by you or by the Management Corporation upon thirty days' notice in writing, or by either, for cause, without notice. . . .

"Your continued service with the company as a district supervisor and agent will constitute your acceptance of this appointment and approval of its terms and conditions."

Plaintiff testified he complied with all the provisions of the above letter and there was nothing different about them from what he had been doing, with the exception of the termination provision about which he made many verbal protests. He continued to act as district supervisor in the same manner as previously. He testified he did not consider the letter an appointment as district supervisor because he had been appointed in 1938.

On or about June 27, 1947, plaintiff received from Services a letter transmitting "your new district supervisor's agreement which incorporates the changes to become effective

July 1, 1947, and which replaces any agreement or agreements issued to you previously." The new "agreement" made no change in the method of performance; the overwriting commissions were reduced to 2 per cent on renewal business; it used the same "appointing" language as in the 1944 letter and the same language with respect to termination and acceptance.

Another similar letter issued to the plaintiff on October 28, 1952, effective October 1, 1952. In this letter, however, it was stated that the district manager agreed "to devote his full working time to the duties imposed upon him by this appointment; and to refrain from the writing of insurance for his personal account," and that his commission on renewal business was to be "25 per cent of the total of such local agents' renewal business compensation." Another departure from the terms of the 1944 and 1947 letters was that "All prior agreements, whether written or oral, between the parties hereto and which relate to the same subject are hereby terminated as of the effective date of this appointment." Nelsen again protested about the 1952 letter.

With respect to these various "letters of appointment" Nelsen and other district supervisors had meetings with the executives of Services and discussed the question whether the termination terms, etc., applied to them; and "they told us you can continue under the old basis, and we assumed we were;" that "Mr. Wittwer made that statement in 1947;" and that—

"Well, we were just led to believe that we old-timers had nothing to worry about; we could continue as we had; stay with us and you have nothing to worry about."

Adam Pinkerton, a district supervisor from Green Bay, testified that from the first district supervisors' meeting which he attended in the late fall of 1944, "at practically every meeting, the district supervisors were assured that they

owned their business, they owned their district, and they owned their agency." At a meeting in 1947 after Services cut the district supervisors' overwriting commissions on renewal business from 4 per cent to 2 per cent, Mr. Wittwer said "if we don't like it, now is the time to get out, but if you stay with us, you have nothing to worry; you will have a little company or little citadel, little insurance company of your own, something to that effect."

Allie Radtke, a district supervisor in Watertown, corroborated Pinkerton's testimony as to the assurances of Mr. Wittwer and testified that after he received the letters of appointment "I operated on the word told to me."

Sometime after 1951 a pamphlet was printed for public distribution under the name of "Farmers Mutuals" in which it was stated, among other things:

"A BUSINESS OF YOUR OWN
"There are few men who do not dream at some time or other in their lives of owning a business. . . .

"Why then do so many men hesitate to consider entering the business for themselves? Mainly because of the many difficulties presented in starting a business and the lack of security. . . .

"Farmers Mutual Plan of Operation is so designed to make it especially easy for you to have your own business."

The above language was read to Mr. Wittwer on cross-examination and he testified he didn't say that.

"*Q*. I see. There is no question about it though that this is a document that your company got out. *A*. Well, these advertising men, they put out fancy words some time. I didn't say that.

"*Q*. Do the advertising men put out things that are not true? *A*. Not necessarily true, no, this does not come from my words, from my lips.

"*Q*. But are you trying to tell me your advertising men put this out and it isn't so? *A*. If it is out, they must have put it out."

Services never made social security payments on the plaintiff after July 1, 1938, or on other district supervisors. Nelsen filed as a self-employed person. Services had furnished to the internal revenue department affidavits asserting that district supervisors were independent contractors and not employees.

The Insurance Company by resolution of October 25, 1951, changed its company policy to require that all district supervisors devote full time to their supervisorship duties. The Wisconsin district supervisors, including Nelsen, met with Mr. Rammer who, Nelsen testified, told them he would try to have the company change the resolution. The district supervisors sent a committee of six of their members, including Nelsen, to confer with the home office in an attempt to get the policy changed, and further negotiations were carried on, including the submission to Services of detailed written suggestions of the district supervisors for working out their difficulties. These negotiations were unsuccessful and in October of 1952 the new letter of appointment was issued incorporating the requirements to which the district supervisors objected.

Thereafter, in the spring of 1953, Nelsen signed a contract as district supervisor for Market Mens Mutual. In December, 1953, the defendant Services terminated Nelsen's appointment as district supervisor, effective January 15, 1954, on the ground of noncompliance with the full-working-time requirement.

The case was tried to a jury. The special verdict follows:

"Question 1: In 1938, when the plaintiff became a district supervisor for the defendants, was it agreed that the plaintiff would have an interest which would not be terminated so long as the defendants sold insurance in such district?
"Answer: Yes.          Dissenting jurors: None.

"Question 2: Did the plaintiff accept the terms of the letter of appointment of August 23, 1944, as a modification of his terms of service with the defendants?

"Answer: No.                    Dissenting jurors: None.

"Question 3: Did the plaintiff accept the terms of the letter of appointment of June 27, 1947, as a modification of his terms of service with the defendants?

"Answer: No.                    Dissenting jurors: None.

"Question 4: Did the plaintiff accept the terms of the letter of appointment of October 28, 1952, as a modification of his terms of service with the defendants?

"Answer: No.                    Dissenting jurors: None.

"Question 5: In 1938, when the plaintiff became a local agent for the defendants, was it agreed that the expirations and renewals of the business produced by such local agency would belong to the plaintiff?

"Answer: Yes.                   Dissenting jurors: None.

"Question 6–A: Was the plaintiff's agreement to represent the Market Mens Mutual Insurance Company in 1953 a breach of his contract with the defendants?

"Answer: No.                    Dissenting jurors: None.

"Question 6–B: If you answer question 6–A 'Yes' then answer this question:

"Was such breach justified by the preceding relationship between the parties?

"Answer:                        Dissenting jurors:

"Question 7: What sum of money will reasonably compensate the plaintiff for the termination of his relationship with the defendants as:

"(a) District supervisor:

"Answer: $39,000.              Dissenting jurors: None.

"(b) Local agent?

"Answer: $5,000.              Dissenting jurors: None."

In our opinion these questions covered all the issues involved and were properly for the jury. We will take up the jury findings in order.

Nelsen maintained that his contract with Services was oral and that it was agreed he should serve as district super-

visor as long as the Insurance Company wrote insurance in his district; that under its terms he was to look for, train, appoint, and supervise agents within his assigned territory, advertise the company name, and develop the territory, all at his own expense. His compensation was to be an overwriting commission on all business of the local agents.

Services contends that the oral contract is void because it is vague and indefinite and lacks mutuality; that it is for an indefinite term and therefore terminable at will; or that it is void under the statute of frauds as incapable of performance within one year. We do not agree.

It is significant that the oral contract under which plaintiff entered upon, and performed, his duties as a district supervisor admittedly governed the relationship between him and Services for six years after 1938. It can hardly be maintained that its terms were so vague and indefinite as to be incapable of mutual understanding in the terms on which Services now argues there was no agreement. Kalbskopf's testimony makes it clear that both he and Nelsen understood what Nelsen's duties and obligations as a district supervisor were, and the letter of June 16, 1938, specified his territory. The principal argument on this point seems to be that on Nelsen's compensation, his rate of commissions, there was no agreement. Nelsen testified:

"The overwriting was a smaller percentage than what the local agents got on their own business. They made many changes over the years on the overwriting, so I wouldn't know exactly what it was in 1938."

Whatever the rate was, Services paid it to Nelsen and Nelsen accepted it. The parties lived under this contract for six years before Services made the first attempt to modify it; proof of the payment of Nelsen's overwriting commissions is in evidence. We can see no lack of mutuality in that respect. In 1 Corbin, Contracts, p. 319, sec. 101, it is stated:

"Even though the parties have expressed an agreement in terms so vague and indefinite as to be incapable of interpretation with a reasonable degree of certainty, they may cure this defect by their subsequent conduct and by their own practical interpretation. . . . If the expressions used leave the subject matter, or the price or the time or any other element of the performance incapable of determination, the rendition of a part or all of the performance may make clear the meaning that should be given to those expressions."

Moreover, it is undisputed that Nelsen performed the duties imposed on him by the original agreement until his services were terminated in 1953. From July 1, 1938, when he took the district supervisorship he built up the agency force in his territory and advertised Farmers Mutuals at his own expense; Services accepted the benefits thereof and paid him overwriting commissions on the business of his local agents. From the time Nelsen commenced the performance of his duties, expending his time, effort, and funds, the contract was at least partially executed, and—

". . . under the repeated decisions of this and other courts, even though a contract is not enforceable while executory by reason of want of mutuality, it becomes valid when executed." *Oconto Brewing Co. v. Cayouette* (1909), 138 Wis. 664, 666, 120 N. W. 497.

As to the contention that the contract was for an indefinite term and therefore terminable at will, we may say that practically all the cases cited by appellant are cases of "employment" which are not applicable since appellant has always maintained that Nelsen was not an employee but an independent contractor. Nor is *Kuhl Motor Co. v. Ford Motor Co.* (1955), 270 Wis. 488, 71 N. W. (2d) 420, applicable here. In that case there was a written contract providing for termination at any time at the will of either party by sixty days' written notice. The question on appeal

involved the effect of applying sec. 218.01 (3) (a) 17, Stats., to that contract.

*Lewis v. Minnesota Mut. Life Ins. Co.* (1949), 240 Iowa, 1249, 37 N. W. (2d) 316, is also distinguishable. The parties originally entered into a written contract of agency providing for termination by either at any time upon written notice. The evidence was in dispute as to whether or not the written contract was subsequently modified orally to retain plaintiff as agent for his lifetime. The court found that the evidence was insufficient to establish such modification and failed to show any additional consideration for the claimed lifetime agreement. On this state of the evidence the court held that in the absence of a consideration in addition to the services to be rendered, such contracts are indefinite hirings, terminable at the will of either party.

The oral contract is not within the statute of frauds. Appellant contends that Nelsen's own testimony establishes the fact that the parties were making a contract for long duration,—that it was understood that the building up of the district agency was a slow process, that Nelsen would have no immediate substantial returns from his investment of time and money and that the only substantial returns were contemplated for years in the future. This does not mean, however, that the contract was incapable of performance within a year from the time it was entered into. The contract was to be continued until the Insurance Company discontinued writing insurance in Nelsen's district or until Nelsen discontinued operating in the district. Conceivably, either of these contingencies might have occurred within the year.

"If, by possibility, an agreement may, by its terms, be executed within that time, it is not within the statute." *Jilson v. Gilbert* (1870), 26 Wis. 637, 642.

The crux of the question, however, lies in the fact that, as stated above, Nelsen's performance under the contract, from

the moment he started spending his time and money in building up the district agency, constituted a valuable executed consideration for the promise of Services to continue the contract so long as the Insurance Company wrote insurance in Nelsen's district. Such promise, even though by its terms it was not to be performed within a year, is not within the statute of frauds. *McClellan v. Sanford* (1870), 26 Wis. 595.

Nelsen's testimony as to the terms of the 1938 oral agreement is corroborated by that of Kalbskopf, and the jury was entitled to believe it. Services conceded that the arrangement from its inception until at least 1944 was an oral one. It offered no evidence tending to show that the terms of the oral agreement were other than what Nelsen and Kalbskopf said they were. Further, the testimony of Ihlenfeldt as to his original appointment as a district supervisor and the Ralph Williams document, together with Kalbskopf's testimony with respect thereto, constitute strong evidence that all the appointments of district supervisors made before 1944 contained those terms. The inference is—and the jury was entitled to draw it—that during that period while the Insurance Company was still comparatively small and interested in building up agency business at the expense of the district supervisors, Services could not have accomplished that result except by promising its district supervisors future protection and security in realizing the fruits of their effort, risk, and expense. It may be, as Mr. Rammer testified, that he and Mr. Wittwer were unhappy about some of the promises Kalbskopf was making in recruiting district supervisors, but they never did anything about it and the jury could well believe that by their silence they ratified the oral contracts Kalbskopf was making with the supervisors. The language of the pamphlet referred to above is also of significance on this point. It is obviously an attempt to recruit district and local agents for Services and states, "Farmers Mutual Plan

of Operation is so designed to make it especially easy for you to have your own business." Mr. Wittwer, when questioned about this, would not say that the statement was false, but only insisted that the words were not his and that the advertising men sometimes "put out fancy words."

There being credible evidence from which the jury could find, in answer to the first question in the special verdict, that Nelsen acquired by his oral agreement an interest which would not be terminated so long as the defendants sold insurance in his district, it must be held that plaintiff had an agency coupled with an interest. Nelsen's power and authority to continue as district supervisor were intended to provide security to him and he agreed to expend his own time and money to build up a sales force which would be his property. Under the rules, therefore, his agency was irrevocable. As stated in 2 C. J. S., Agency, p. 1159, sec. 75 a:

"Although a contract not to revoke an agency only abridges the right of the principal to revoke, . . . and not his power to revoke, . . . yet where the authority given the agent is supplemented with an interest or estate in the subject matter of the agency itself, the rule is well established both at common law and by statute that both the right and the power to revoke the agency without the agent's consent is taken away; and a purported revocation can have no effect unless by express provision the power remains revocable. Such a power is from its nature irrevocable, whether or not expressed to be so, . . ." See also Restatement, 1 Agency, Termination, pp. 350 *et seq.,* sec. 138.

The next question, comprising the jury's findings to questions 2, 3, and 4 of the special verdict, is whether Nelsen accepted the terms of the letters of appointment of 1944, 1947, and 1952 as modifications of his 1938 oral contract. If there were such acceptance, it would constitute Nelsen's consent to revocation of his agency by Services.

The rule is:

"Modification must be made by the contracting parties or someone duly authorized to modify, and one party to a contract cannot alter its terms without the assent of the other parties; the minds of the parties must meet as to the proposed modification." 17 C. J. S., Contracts, p. 860, sec. 375.

Nelsen testified that he never accepted the terms of these letters of appointment which would have modified his oral contract, to wit, that the appointments were terminable upon written notice and that, in the 1952 letter, he would devote full time to his district supervisorship duties, refraining from the writing of insurance for his personal account. He testified that he verbally protested the attempted modifications. Appellant argues that this testimony is not worthy of belief, since he also stated he had sent letters of protest to Services but could not produce copies of such letters, and because he continued to perform as a district supervisor thereafter, which by the terms of the letters of appointment constituted his acceptance of the appointment and his approval of its terms.

Nelsen's credibility was, of course, for the jury. His testimony about protesting was corroborated by that of Adam Pinkerton who testified that after the letters of appointment were received by the district supervisors they had meetings with representatives of Services on the subject of the attempted modifications; that Nelsen was present at these meetings; that "statements were made relating to the distinction between the older and the newer supervisors," the older men being assured that "they owned their business, they owned their district, and they owned their agency." Allie Radtke testified to the same effect.

As to Nelsen's continued performance after receipt of the letters of appointment, there was, of course, the evidence set out above that he was led to believe that he would continue operating under his original contract. The only substantial difference between the terms of the oral agreement and the conditions set out in the 1944 letter was the termination

clause, which could not be effected without the consent of Nelsen. This provision in no way affected the details of Nelsen's operations. The letter stated that his duties included regular contact with his agents, the performance of all functions necessary to promote his interests as agent and supervisor and the interests of Farmers Mutual in producing and servicing its business; his status as district supervisor required that he make that his principal business; that he would abide by the rules, regulations, rate schedules, and instructions set forth in the Farmers Mutual manual and any other rules and regulations promulgated by the Insurance Company and Services; that he would handle whatever new lines of business that Services might expand its activities to cover; that all expenses necessary to carrying on his functions as district supervisor would be borne by Nelsen; that he would be paid overwriting commissions on all business written in his territory. Nelsen testified these were all terms which were included in his oral contract and he simply continued operating as he had in the past,—"My performance afterwards was as consistent with my original arrangement as with the letter."

In 4 Page, Contracts (2d ed.), p. 4357, sec. 2458, it is stated:

"While the parties to a contract may modify it by a subsequent contract which is shown by their acts, the acts which are relied upon to modify a prior contract must be unequivocal in their character. Acts which are ambiguous in their character, and which are consistent either with the continued existence of the original contract, or with a modification thereof, are not sufficient to establish a modification."

In the 1947 letter there was an additional difference,—a reduction in the overwriting commissions on renewal business from 4 per cent to 2 per cent. At meetings with the representatives of Services after receipt of this letter, the reduction in commissions was discussed, as well as the termi-

nation clause, and Nelsen and the other supervisors apparently agreed to accept the reduction on Mr. Wittwer's assurance that if the men stayed with Services they would be building their own business and a pension for life.

The 1952 letter was preceded by a resolution of the Insurance Company that company policy would be changed to require all district supervisors to devote full time to the supervisorship duties and to refrain from writing personal business. Both before and after the 1952 letter was issued, the district supervisors protested this requirement and met with Services in an attempt to have the policy changed. Nelsen was active in these negotiations. The 1952 letter also stated:

"All prior agreements, whether written or oral, between the parties hereto and which relate to the same subject are hereby terminated as of the effective date of this appointment."

Upon failure of the negotiations Nelsen's services were terminated. From the evidence before it, the jury was warranted in finding that the modifications attempted in the 1944, 1947, and 1952 letters of appointment were never accepted by Nelsen.

The jury's finding with respect to question 5 must likewise be upheld. Question 5 relates to the terms of the oral contract with respect to Nelsen's personal agency. Nelsen testified that one of its terms was that he maintain a personal local agency which he would own. In answer to the question the jury found that under the contract of 1938 it was agreed that the expirations and renewals of the business produced by Nelsen's agency belonged to him. The question is whether, when the insurance policies of Nelsen's personal customers expired, did he have the exclusive right to contact them for the purpose of renewing the policies? This exclusive right in the agent is called "ownership of renewals and expirations." It is sometimes called the American Agency System.

Appellant maintains that it never operated under the American Agency System during the time that Nelsen was its agent. Nelsen admitted that the Insurance Company sent out renewal certificates and premium notices directly to policyholders and that such method was specified in the agents' manual and the policies. However, Alex Opgenorth, an attorney employed by Services, in giving his definition of the American Agency System, testified that there are companies operating under the system which make direct collections from the insured but refrain from disturbing renewals upon termination of the agency.

In 1951 a district supervisor for Services in Indiana inquired of his state director, Frank B. Lamb, whether Farmers Mutuals operated under the American Agency System. In a letter introduced in evidence as Exhibit 35, Mr. Lamb advised as follows:

"Regarding your inquiry pertaining to whether or not agents owned and controlled their expirations in Farmers Mutual Automobile Insurance Company, please be advised that we operate under the American Agency System. As you know under this system the agents own their expirations.

"Under the Farmers Mutual Auto System we mail out premium notices twenty days before the premium is due. Your inquiry specifically asks the procedure that Farmers Mutual Auto follows when an agent decides to terminate his connection with the company, or the company decides to terminate the agent's connection. When such an event occurs, the agent can dispose of his business as he sees fit. If he decides to remain in the insurance business, and he does not wish to have the company mail out premium notices to his assureds, he can so advise the company, and in lieu thereof expiration notices will be sent to each policyholder as his premium comes due."

In the 1943 letter to Williams, referred to above, which was signed by Mr. Kalbskopf as treasurer of the Insurance Company, it was stated as one of the "major conditions

governing the appointment of all Farmers Mutual district supervisors:"

"The renewals of all personal business written by you shall be and remain your property in the event of termination of your connection with this company, and shall be property of your estate in the event of your death."

Kalbskopf also testified that he told Nelsen he would own his own renewals and his own local agency,—"We told all district agents. Couldn't hire them without giving them some incentive to work."

Appellant contends it was error to admit the Williams contract and the Lamb letter in evidence. Its sole objection to their admission was on the ground of relevancy. Appellant's witness, W. B. Kinnamon, testified that "Nobody in authority in the company has ever represented that the company was under the American Agency System, or that the agent owns the renewals." Kinnamon testified that he trained Frank Lamb and told him what the company policy was. As evidence of what that policy was, the documents were relevant and admissible.

In its answer to question 6 of the special verdict the jury found that Nelsen's agreement to represent Market Mens Mutual Insurance Company in 1953 was not a breach of his contract with Services. In connection with this question the following evidence is significant. On October 25, 1951, the board of directors of the Insurance Company adopted the resolution which required that district supervisors devote full time to their supervisorship duties. Nelsen testified that he believed copies were sent to the district men. In any event, the district supervisors learned of it and met with executives of Services in an effort to have the policy changed, and on February 26, 1952, Nelsen, on behalf of a committee selected by the supervisors to negotiate with Services on the controversy, submitted to Services detailed written suggestions regarding the agency system, the district supervisors' per-

sonal agencies, and a proposed district supervisors' contract. These negotiations continued after issuance of the October 28, 1952, letter of appointment. Services, however, was adamant and insisted that Nelsen give up his personal agency. This requirement constituted a breach of the 1938 oral contract by Services, since under that agreement Nelsen was permitted to maintain his personal agency. It was recognized in the 1951 resolution that the new policy of requiring district supervisors to go on a full-time basis was contrary to the original arrangement. The resolution stated, in part:

". . . the company recognizes that at present there are 'nonconforming' district supervisors who for valid and sufficient reasons in the early stages of the company's development were not required to devote full time to supervisory duties and were permitted to write for their own personal accounts business which might otherwise have been written by agents appointed for that purpose."

It was not until the spring of 1953 that Nelsen entered into a district supervisor's agreement with Market Mens Mutual. He testified he did so because it had become clear to him by that time that Services would terminate its agreement with him if he did not give up his local agency, because a number of his "brother district men" had already been ousted by Services and he knew he was "on the way out."

The evidence further showed that the writing of insurance for other companies was not in violation of the terms of the 1938 oral agreement. When Nelsen became a district supervisor for Services both parties recognized that Farmers Mutual was a small company writing assessable policies and it would be some time before Nelsen would realize a substantial return from his investment of time and money in the supervisorship. Nelsen testified:

"They said you would have to write insurance for other companies in order to eat and because Farmers Mutual only wrote one or two lines of insurance. . . .

"The directors of the company were aware of the fact that I wrote insurance in other companies, from the outset. They told us to; they told me to, rather. They told the other district men, too. As a matter of fact, they recommended a life insurance company for me."

The evidence supports the jury's finding with regard to question 6.

Finally, as to the assessment of plaintiff's damages, appellant contends there is no proof in the record as to the amount of damages Nelsen suffered by reason of the termination of his district supervisor's contract. The evidence shows that Nelsen earned $14,000 in overwriting commissions in 1953, based upon a gross business in his territory of $477,000. It shows that the premium volume increased $70,000 in 1953; that his successor did a business of almost $503,000 in 1954 and over $541,000 in 1955. The trial court observed in its decision on motions after verdict that although the determination of damages in such a case as this cannot be made by application of a standard formula, it does not follow that the conclusion arrived at by the jury is speculative, citing *Tetzlaff v. Pilot Press* (1955), 270 Wis. 214, 70 N. W. (2d) 678, and 25 C. J. S., Damages, p. 493 *et seq.*, sec. 28. In the trial court's opinion "the amounts set by the jury are within the range of reasonableness."

The jury was instructed to determine the value of Nelsen's district agency on January 15, 1954, taking into consideration any loss of profits he had sustained and might reasonably have realized in the future from said agency. It was further instructed not to deduct from such damages any sum which Nelsen earned or may earn in the future from any source whatever. Appellant argues the instruction was erroneous and prejudicial. The trial court, in dealing with this matter in its decision, stated:

"The whole theory of the plaintiff's case is that this was his business and that it was improperly taken from him by

the defendants. When the defendants deprived plaintiff of an asset he owned, the damages were determinable from the value of that asset at the time; they were not to be reduced by his personal earnings. The value of the asset was not to be determined by the wages earned by its owner. The plaintiff's insurance business had value which was to be determined from its inherent worth; it was not to be found by computing how much its owner was able to earn from his personal services after the loss of such business."

In so holding, the trial court relied upon the rule enunciated in *Richey v. Union Central L. Ins. Co.* (1909), 140 Wis. 486, 491, 122 N. W. 1030, quoting therefrom, in part, as follows:

"The point is made that the amount of damages so found should have been reduced by what the respondent earned outside of the contract employment after breach and before trial. The court properly refused this deduction. This is an action to recover the damages caused by the breach of the contract to respondent's agency business, built up under this agreement. When appellant terminated the agreement and destroyed the business its liability became fixed. It was responsible for the value of the agency business as it then existed and which went out of existence by its illegal act."

*By the Court.*—Judgment affirmed. Respondent's request for permission to tax costs for printing brief in excess of 50 pages granted.

HALLOWS, J., took no part.