**BLOOMFIELD FINANCIAL CORPORATION, Plaintiff-Appellee/Cross-Appellant,**

v.

**NATIONAL HOME LIFE ASSURANCE COMPANY,**
**Defendant-Appellant/Cross-Appellee.**

Nos. 82–1316, 82–1326.

United States Court of Appeals,
Tenth Circuit.

May 16, 1984.

Miles C. Cortez, Jr., Englewood, Colo. (Phillip D. Barber and S. Kirk Ingebretsen, Denver, Colo., with him on the briefs) of Welborn, Dufford, Cook & Brown, Denver, Colo., for plaintiff-appellee/cross-appellant Bloomfield Financial Corp.

George J. Miller, Denver, Colo. (Christopher R. Hermann, Denver, Colo., with him on the briefs) of Dechert Price & Rhoads, Denver, Colo., for defendant-appellant/cross-appellee Nat. Home Life Assur. Co.

Before BARRETT and LOGAN, Circuit Judges, and BOHANON, District Judge.*

LOGAN, Circuit Judge.

In this diversity case an insurance sales agent, Bloomfield Financial Corporation (BFC), sued for breach of its agency contract with National Home Life Assurance Company (NHL). BFC claimed that NHL (1) failed to honor its agreement to pay BFC commissions equal to the highest percentage commission of any agency doing business with NHL, (2) breached its implied duty of good faith and fair dealing, and (3) unilaterally terminated the contract after notifying BFC that it would no longer distribute its policies through personal producing agents. BFC sought damages for the value of the agency contract, including lost profits flowing from its impaired ability to recruit and retain agents because NHL paid higher percentage commissions to another agency. In addition, in a separate tort action BFC asked for compensatory and punitive damages based on NHL's breach of its implied duty of good faith and fair dealing. The trial court granted NHL's motion to dismiss the tort claim, reasoning that the Colorado Supreme Court

* Honorable Luther L. Bohanon, Senior United States District Judge for the District of Oklahoma, sitting by designation.

probably would not recognize an independent tort action for breach of implied contractual duties. BFC's three contract claims were submitted to the jury. After answering special interrogatories, the jury rendered a general verdict for BFC for $750,000.

NHL asks us to grant a new trial on the award of contract damages, alleging that the trial court erred by (1) permitting proof of gross rather than net profits and failing to require the jury to reduce damages to present worth, (2) allowing the jury to assess damages without any evidence as to how much of the loss was caused by the breach of contract and how much by market forces, (3) excluding evidence on mitigation of damages and failing to properly instruct the jury on BFC's duty to mitigate, (4) permitting prejudicial testimony of NHL's acts which were actually done in conformance with the contract, and (5) admitting into evidence a memorandum prepared by NHL attributing a value to BFC's contract because the memorandum was part of settlement negotiations. NHL also asserts that it was entitled to judgment notwithstanding the verdict (1) because the parties did not contemplate BFC's loss when they negotiated the contract, (2) because NHL's duty to deal in good faith could not be implied from any provision of the contract, and (3) because NHL was free at any time to cease marketing its products through outside sales agencies.

BFC appeals the trial court's dismissal of its tort claim, contending that the Colorado Supreme Court would recognize the concurrent tort and contract liability of a party that breaches its implied duty of good faith and fair dealing.

I

Before 1973 NHL marketed almost all of its insurance plans through the mail. Thomas Long and Kenneth Manley, the owners of BFC, approached the executive vice president of NHL, Robert Safford, about selling NHL insurance plans through a sales force of personal producing agents. NHL ultimately accepted the proposal and signed a standard agency sales contract in October 1973. After enjoying immediate success selling NHL products in Michigan, Long and Manley, on behalf of BFC, signed a second agreement with NHL in August 1974. This agreement provided that NHL could terminate its agency agreement with BFC only if BFC engaged in fraud or unethical practices, became bankrupt, or failed to satisfy an annual production quota. This provision appeared in all subsequent agreements between the two companies.

During the term of a third agreement signed in 1976, BFC expanded its NHL sales operation to Colorado. BFC and NHL executed the final agreement on February 3, 1978. At this time and for the preceding years, BFC had produced more premiums for NHL than any other agency. The 1978 agreement was similar to the 1976 agreement and was, according to general counsel for NHL, the best contract the company had ever given a general agent. The contract declared that the commissions payable to BFC "with respect to any policy or plan of insurance shall at all times equal the highest percentage commission payable by the Company." In addition, BFC was to receive an annual 5% vested bonus.

Beginning in October 1978, NHL began paying higher commissions to the A.L. Williams agency than to BFC. BFC witnesses indicated that the Williams agency and its agents could make 52% more commission on a single sale than BFC and its agents, and up to 140% more commission if a rider (in essence, an additional policy for a family member of the insured) were sold with the policy. At least three of NHL's senior officials admitted that payment of the higher commissions to the Williams agency breached its 1978 agreement with BFC. BFC officers testified that payment of higher commissions to the Williams agency made it difficult for BFC to recruit new agents and keep existing agents on the job.

After BFC complained that they were receiving lower commissions than the Williams agency, NHL set up the "Long-Manley" committee to study the 1978 agree-

ment. Stephen West, general counsel for NHL and chairman of the committee, concluded that NHL could not terminate the agreement except for nonproduction. West wrote in a memorandum opinion to NHL officers: "The draftor [sic] of [the 1978] Agreement has effectively tied up NHL to a degree that I see no viable means of terminating this Agreement unless we have a concerted plan to so alienate L/M [Long-Manley] as to cause them to cease writing business." As a result NHL's division of agency operations gave BFC's business the lowest priority for processing, and NHL's personnel consistently failed to return BFC's phone calls. In July 1979 West sent a letter to BFC stating that BFC could only communicate with four persons at NHL and that the communication must be in writing. NHL officials stated that they had never heard of such a restriction, and one official testified that the restriction "in effect put them [BFC] out of business."

BFC was finally forced to close the Colorado office but was able to keep the 1978 agreement in force by producing enough first-year premiums to avoid termination. Nonetheless, NHL unilaterally terminated the agreement by a letter dated December 24, 1980. The letter stated, in pertinent part,

"Effective February 1, 1981, National Home Life will no longer distribute its life and health products through personal producing general agents. This decision was made as a result of a prior management decision to withdraw the Company's deposit term line of products. In as much as this line of products accounted for a substantial majority of the overall production, management has decided that distribution of the remaining products through personal producing general agents would not be cost effective."

Despite the letter NHL continued to market policies and plans of insurance through personal producing agents. Donald Williamson, NHL's Senior Vice President of Personal Sales, testified that some of the 250 agents now with NHL were with NHL before the December 24, 1980, letter was sent. Many of the policies that NHL now sells through these agents NHL sold through BFC before NHL terminated the 1978 agreement.

## II

NHL argues that a new trial should be granted on the issue of damages because the trial court permitted the jury to base its award on evidence of BFC's loss of gross rather than net profits. BFC established its damages primarily through the testimony of Thomas McComb, a consulting actuary, who testified regarding the net value of NHL's 1978 agreement at the time of the breach. McComb's approach was to compute BFC's net income loss in a single year based on the amount of premiums BFC would produce in an average year. Once McComb calculated this loss, he arrived at the total net present value of the 1978 agreement based on an assumed duration for the agreement and an assumed discount rate. *See Massachusetts Bonding & Ins. Co. v. Johnston & Harder, Inc.*, 348 Pa. 512, 35 A.2d 721, 724 (1944) (under Pennsylvania law contract damages are measured by the value of the contract on the date of breach, taking into account the length of time the contract is assured of legal existence).[1] McComb relied on information from BFC that the office expense allowance received from NHL covered all of BFC's costs incurred in generating new first year premiums. NHL did not offer evidence that the office expense allowance failed to cover the cost of producing new business or that the damage calculations of McComb reflected anything other than loss of net revenues. Rather, relying upon BFC tax returns which show that BFC incurred other expenses, NHL asserts that the "office expense allowance was not comparable to all the costs of running the business." Brief for Defendant-Appellee/Cross-Appellant at 13. We believe McComb's testimony focused on the net

---

1. Both parties agree that because the 1978 agreement was negotiated and executed in Pennsylvania that state's law applies to the interpretation of the contract's provisions.

profitability of the 1978 contract and hence was properly admitted.

■ NHL further asserts that BFC failed to demonstrate how much income loss was caused by NHL's breach and how much by market factors. However, BFC proved the amount of net profits it lost under the 1978 agreement because of NHL's breach and called witnesses who discussed the impact of various market factors on BFC's business. The evidence in the record adequately supports the jury's verdict.

### III

■ NHL argues that the trial court erroneously instructed the jury on BFC's duty to mitigate damages and erroneously excluded evidence of the personal earnings of BFC's owners, Long and Manley, following the breach. The court's instruction on mitigation of damages was as follows: "You are instructed that a corporation has the duty to take such reasonable steps under the circumstances as will minimize its damages. Any damages resulting from a failure to take such reasonable steps cannot be recovered." We find nothing wrong with this instruction. In *Nelsen v. Farmers Mutual Auto Ins. Co.*, 4 Wis.2d 36, 90 N.W.2d 123 (1958), also a case involving termination of an insurance agency contract, the court approved an instruction directing the jury to determine the value of plaintiff's contract and business on the date of defendant's breach and not to deduct personal earnings of the plaintiff following the breach. The court quoted with approval this statement from the trial court's opinion:

"'When the defendants deprived plaintiff of an asset he owned, the damages were determinable from the value of that asset at the time; they were not to be reduced by his personal earnings. The value of the asset was not to be determined by the wages earned by its owner. The plaintiff's insurance business had value which was to be determined from its inherent worth; it was not to be found by computing how much its owner

was able to earn from his personal services after the loss of such business.'" 90 N.W.2d at 137. The court also relied on the rule that the Wisconsin Supreme Court enunciated in *Richey v. Union Central Life Ins. Co.*, 140 Wis. 486, 491, 122 N.W. 1030, 1032 (1909):

"The point is made that the amount of damages so found should have been reduced by what the respondent earned outside of the contract employment after breach and before trial. The court properly refused this deduction. This is an action to recover the damages caused by the breach of the contract to respondent's agency business, built up under this agreement. When appellant terminated the agreement and destroyed the business, its liability became fixed. It was responsible for the value of the agency business as it then existed, and which went out of existence by its illegal act."

■ The 1978 agreement did not limit BFC to marketing NHL policies nor did it require Long and Manley to personally oversee NHL agency business. While Long and Manley, the owners of BFC, were personally active in the business, they employed office personnel and many agents. Indeed, they had moved to Colorado, leaving the day-to-day management of the Michigan office to other BFC personnel. Under these circumstances, we believe the Pennsylvania courts would not impose a duty to offset earnings of BFC, Long, or Manley after the breach to deprive BFC of damages for NHL's destruction of a BFC asset, the 1978 agreement. *See Willred Co. v. Westmoreland Metal Mfg. Co.*, 200 F.Supp. 59, 63 (E.D.Pa.1961). The mitigation rule applicable in the case at bar is analogous to the damage rule applied in lost-volume sales cases. For example, when a buyer breaches a contract to purchase an automobile from a dealer, the dealer is entitled to the benefit of its bargain whether or not it ultimately resells the car intended for the breaching customer. This is so because in theory the dealer can supply as many new cars as there are

buyers. The fact of resale demonstrates that two or more buyers exist and that the seller could expect to earn two profits once the original buyer agreed to make his purchase. *See* D. Dobbs, *Remedies* 889 (1973). Here the 1978 agreement did not limit BFC to marketing NHL policies. BFC could have performed similar services for other insurance companies.

### IV

■ After examining the applicable Pennsylvania law on discounting damage awards for loss of future income, the trial court concluded that the Pennsylvania Supreme Court would apply the "total offset" rule in this case. The total offset rule assumes that the rate of inflation will cancel out the discount rate and thus does not permit any alteration of the damage award. NHL, citing *Windle v. Davis*, 275 Pa. 23, 118 A. 503 (1922), contends that the jury award in this case should have been discounted to present value. We disagree. In *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980), the Pennsylvania Supreme Court wrote: "[W]e find as a matter of law that future inflation shall be presumed equal to future interest rates with these factors offsetting. Thus, the courts of this Commonwealth are instructed to abandon the practice of discounting lost future earnings." 421 A.2d at 1038–39. NHL contends that the rule in *Kaczkowski* is limited to wrongful death cases. The *Kaczkowski* court did note that it did not intend to fashion a general rule applicable to all awards and said that whether the total offset rule should be applied should be resolved on a case-by-case basis. 421 A.2d at 1036 n. 21. But after *Kaczkowski* the courts have extended the total offset rule to personal injury cases. *Funston v. United States*, 513 F.Supp. 1000, 1009 (M.D.Pa.1981); *Barnes v. United States*, 516 F.Supp. 1376, 1390 (W.D.Pa.1981), *aff'd*, 685 F.2d 66 (3d Cir.1982). The assumption that inflation will offset the interest earned on a lump sum award applies to lost future commissions just as it applies to other lost future income. We see no meaningful distinction between *Kaczkowski* and

the case at bar. The trial court did not err in concluding that the Pennsylvania Supreme Court would apply the total offset rule to the facts of this case. *See Pfeifer v. Jones & Laughlin Steel Corp.*, 678 F.2d 453, 456 (3d Cir.1982) (discounting a lump sum award for lost future earnings is a practice effectively abolished in Pennsylvania).

### V

■ Defendant argues that the trial court should have entered a directed verdict against BFC on its cause of action for unilateral termination of the 1978 agreement. The 1978 agreement provides that the only grounds for termination are BFC's bankruptcy, fraudulent conduct, or lack of production. The contract could continue indefinitely. NHL asserts that *Moore v. Security Trust & Life Insurance Co.*, 168 F. 496 (8th Cir.1909), *cert. denied*, 219 U.S. 583, 31 S.Ct. 469, 55 L.Ed. 346 (1910), indicates that a company cannot negotiate away its right to terminate a product line or sell its business. The *Moore* Court examined a claim arising from the defendant insurance company's transfer of its business to a rival company. The court said that plaintiffs' claim that the transfer breached its agency contract was

> "too feeble to withstand the compelling force of the presumption that the plaintiffs could not have intended to surrender control of their own business and services for life, and the defendant could not have intended to surrender its right or to limit the exercise of its right to manage, control, continue, or terminate its business of insurance at will."

168 F. at 500. We believe *Moore* is inapplicable to the case at bar. NHL continues to market policies and plans of insurance through personal producing agents. Many of the products that NHL offers through these agents are the same products that NHL offered through BFC before termination of the 1978 agreement. Clearly, NHL's unilateral termination violated the provision of the agreement giving BFC the right to market *any* policy NHL offers,

especially since the evidence shows that NHL has continued to market insurance products through personal agents. The trial court properly denied NHL's motion for a directed verdict.

## VI

NHL makes a number of other arguments, including that (1) the trial court improperly admitted evidence of the difference in the percentage commission payable on riders; (2) the trial court erred in admitting an intra-corporate memorandum prepared by NHL attributing a value of $569,-000 to BFC's "discounts and deferreds" because the memorandum was part of settlement negotiations; (3) BFC introduced no relevant evidence that would have permitted the jury to determine lost future profits; (4) BFC was not entitled to recover damages except for interest on the amount due BFC by reason of the higher commissions paid to the A.L. Williams agency; (5) BFC should not have received damages for the impairment of its ability to recruit new agents because this loss was not within the contemplation of the parties; and (6) NHL's motion for judgment n.o.v. was improperly denied on BFC's cause of action for breach of the implied duty of good faith and fair dealing because this implied duty cannot be implied from any provision in the contract. Some of these arguments are subsumed in the discussion above. We have examined all of the arguments and find them meritless.

## VII

■ Finally, BFC appeals the dismissal of its tort claim for compensatory and punitive damages for breach of implied contractual duties.[2] After noting that several jurisdictions now recognize an independent tort action based on "oppressive or willful and wanton breach of the implied duty of good faith and fair dealing," the trial court concluded that the Supreme Court of Colorado would not recognize an independent tort action for breach of implied contractual duties.[3]

Colorado maintains a sharp distinction between tort and contract actions, defining tort as the breach of a legal duty arising by law, independent of contract. *Newt Olson Lumber Co. v. School District Number Eight*, 83 Colo. 272, 274, 263 P. 723, 724 (1928); *see also Davis Cattle Co. v. Great Western Sugar Co.*, 393 F.Supp. 1165, 1196 (D.Colo.1975), *aff'd*, 544 F.2d 436 (10th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1109, 52 L.Ed.2d 541 (1977). In *Davis* the plaintiff claimed that the defendant breached an implied contractual duty to deal in good faith in determining the highest practicable price to be paid for sugar beets. 393 F.Supp. at 1181. Despite expressly finding that defendant breached its contractual obligations in bad faith, the trial court denied recovery in tort.

"The gravamen of plaintiff's claim under ... which I have allowed recovery is ultimately founded on breach of contract—either outright breach of a specific covenant or a bad faith breach of a contractual duty to use good faith. Although I have imposed liability on defendant for its 'fraud, or such gross mistake on (its) part (which implies) bad faith, or a failure to exercise an honest judgment,' this is not equivalent to a finding of common law fraud. What I have ultimately found is bad faith or gross mistake on defendant's part in disobeying its contractual obligations, and I have imposed liability on this ground. I have recognized no tort liability as such. That being true, exemplary damages cannot be awarded under the law of Colorado."

*Id.* at 1196.

BFC would have us ignore such cases as *Newt Olson* and *Davis Cattle* because of Colorado's alleged penchant for following

---

**2.** BFC concedes that it is not entitled to a second recovery of actual damages for NHL's alleged tortious breach of contract. At stake in this appeal is whether NHL is entitled to a jury trial on the issue of punitive damages.

**3.** Both parties agree with the trial court that Colorado law governs BFC's claim in tort.

new tort trends. The cases that BFC cites suggest that the Colorado Supreme Court has typically embraced only those new causes of action consistent with the *Restatement (Second) of Torts* and previously adopted by the courts of numerous other states, *e.g.*, *Towns v. Anderson*, 195 Colo. 517, 579 P.2d 1163 (1978) (impact requirement abolished in cases of negligent infliction of emotional distress); those supported by strong policy considerations, *e.g.*, *Mile High Fence Co. v. Radovich*, 175 Colo. 537, 489 P.2d 308 (1971) (abolition of classification system to determine duty owed to person injured while on another's property); or those in which the Colorado state legislature directed recognition, *e.g.*, *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753 (1970) (recognition of tort action for invasion of right to privacy). None of these circumstances are present here. In fact, recovery in tort for breach of an implied contractual duty has been permitted only in a few jurisdictions, and generally only under extraordinary circumstances. *See B.B. Walker Co. v. Ashland Chemical Co.*, 474 F.Supp. 651, 665 (M.D.N.C.1979) (punitive damages for tortious breach of contract should be assessed when defendant's wrongdoing is intentional and deliberate and rises to a degree of outrageousness frequently associated with crime); *National Homes Corp. v. Lester Industries, Inc.*, 336 F.Supp. 644, 647 (W.D.Va.1972) (recovery of exemplary damages for breach of contract limited to those exceptional cases in which the breach amounts to an independent, willful tort). *But cf. Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 729–30 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980) (court awarded punitive damages to a franchisee for multiple, oppressive, and intentional breaches when evidence showed that defendant sought to ruin plaintiff's business and thereby force plaintiff to resell its franchises to the franchisor at a reduced rate). The trial court did not err in dismissing BFC's tort action.

AFFIRMED.