W.C. and Kenneth STREY, a partnership, on behalf of itself and all others similarly situated, Plaintiffs, Appellees, Cross-Appellants,

v.

HUNT INTERNATIONAL RESOURCES CORPORATION, a Delaware corporation; Great Western United Corporation, a Delaware corporation; the Great Western Sugar Company, a Delaware corporation; Western Investment Company, a Delaware corporation; N. Bunker Hunt and W. Herbert Hunt, Defendants, Appellants, Cross-Appellees.

Nos. 84–1344, 84–1398.

United States Court of Appeals, Tenth Circuit.

Dec. 4, 1984.

See also, D.C., 516 F.Supp. 22.

Ronald L. Olson and Allen M. Katz of Munger, Tolles & Rickershauser, Los Angeles, Cal. (Edwin S. Kahn of Kelly/Haglund/Garnsey & Kahn, Denver, Colo., with them on the brief), for defendants, appellants, cross-appellees.

Edward J. Pluimer of Dorsey & Whitney, Minneapolis, Minn. (James H. O'Hagan, P.A. and James B. Lynch of Dorsey & Whitney, Minneapolis, Minn., Richard L. Schrepferman and David S. Steefel of Holme, Roberts & Owen, Denver, Colo., with him on the brief), for plaintiffs, appellees, cross-appellants.

Before SETH, BREITENSTEIN and DOYLE, Circuit Judges.

SETH, Circuit Judge.

The plaintiffs herein are several thousand sugar beet growers who had entered into contracts with Great Western Sugar (GWS) for the sale of their beet crop. The growers are organized into regional growers' associations. Sales contracts would be negotiated each year whereby the growers agreed to deliver and sell their crop to GWS. There was no continuing year to year obligation on either party and the record shows that the growers increased or decreased the portion of their land they wished to plant in beets from year to year or raised none at all. On delivery of beets to GWS by the growers the sale was completed and the seller was paid a portion of the ultimate price. His beets were tested for sugar content on delivery. The balance of the purchase price was paid by GWS at the end of its sales year for refined sugar. The total contract price was fixed by a formula which determined the "average net return" to GWS on sales of its refined sugar for the sales period. There were historically derived deductions and factors in the formula for the price determination. No issue is presented as to the formula.

The sales contracts recite that the growers are independent contractors. The

record demonstrates, and the witnesses acknowledged, that the growers were creditors of GWS for the balance of the purchase price, that title to the sugar beets passed to GWS on delivery, and that the growers had no ownership in the beets thereafter nor in the sugar.

The contracts were typical sales contracts with the ultimate price to be determined by post-sale events.. Such contracts which depend for pricing upon market prices at an agreed future date or upon profits or returns to one of the parties are not unusual. Such agreements are common in the oil and gas business, in store leases, and licensing agreements.

There was a change in the ownership of Great Western Sugar about the time the sugar beet crops were delivered to the plants under the contracts in question. The new owners decided to engage in trading in the futures market for sugar and other products and metals. GWS, the individuals, and a new corporation traded actively in the futures market.

The plaintiffs in this action seek to participate in the sugar futures profits of defendants which resulted but not in losses. A right of participation is advanced in three main claims in the complaint. They claim that the right to participate arose under the provisions of the contracts although not therein mentioned. They claimed that the sales contract placed a fiduciary duty on GWS to the plaintiffs. The third general claim was based on an implied duty of defendants to perform under the contract in good faith.

The plaintiffs thus claimed that under the sales contract they were entitled to a percentage of profits made by defendants in then futures trading in sugar. This claim was advanced as a right under the term of the contract. The jury however decided that no such rights could be derived from the contracts. This determination was not appealed by the plaintiffs. The futures profits were thus not to be used in the calculation of "average net return." Also, no issue remains, as was advanced by the plaintiffs, that defendants

misrepresented to plaintiffs that there was no such right under the contract.

The case concerns a period when there were large fluctuations in the price of sugar with record highs. There was much testimony as to whether GWS should have hedged the inventory in the futures market to protect its future sugar sales. Also, testimony as to what would have been a hedge in these circumstances was introduced as was testimony as to whether the contracts would have permitted hedging. Hedging had never been done by GWS. There was testimony that the growers through their several organizations reached a decision, expressed to GWS, that they as growers did not want to engage in sugar futures trading in view of possible losses.

The witnesses for plaintiffs testified that GWS should have entered the futures market to hedge the inventory. The witnesses for the defendants testified that it was their view that this could not be done because the growers could not be required under the contracts to share possible losses.

The contracts provided for certain deductions to arrive at "net average return," as above mentioned, and it is questionable whether losses from hedging could have been included.

As mentioned, the jury concluded that participation in futures trading was not provided for in the contract. Hedging in the context in which it here arose is but an aspect of futures trading. The growers did not seek to negotiate a contract which would have included futures trading and, as mentioned, decided not to participate.

One of the basic positions that both parties took going into the trial was expressed in a stipulation that in substance provided that defendants' trading in sugar futures did not affect the cash market for sugar, and GWS pricing decisions had no effect on the futures market. The accuracy of this stipulation was borne out by testimony at trial. The stipulation placed a significant limitation on the contentions of plaintiffs or suggestion that there was some conflict of

interest in the defendants' futures trading and the cash sales by GWS.

■ The plaintiffs also argued as a separate claim, and the trial court took the position, that the sales contracts created a fiduciary duty on the part of GWS to the plaintiffs. The jury included in its award of damages an element for the breach of such a duty. However, the contract provisions do not create a fiduciary duty and the evidence showed that none otherwise existed. The contract was, as mentioned, nothing more than a sales contract with a long used formula for the computation of price. GWS held no property of the plaintiffs, but was at most a creditor for the unpaid portion of the sales price. GWS had the same interest in the "average net return" as did the plaintiffs.

As mentioned, the parties stipulated that the futures trading by defendants had no effect on the cash market for sugar and GWS pricing decisions had no effect on the futures market. There was demonstrated no conflict of interest on the part of defendants as to the futures trading.

We must conclude that the sales contract created no fiduciary duty on the part of GWS and none arose from the practices followed by the parties. The trial court should have granted the motion of defendants for a directed verdict on this claim. Both parties moved for a directed verdict on this issue.

As mentioned, the decisions in oil and gas cases in comparable situations hold that a fiduciary duty is not created. *See 19th Oil and Gas Institute Southwest Legal Foundation,* 165 at 179; *Garfield v. True Oil Co.,* 667 F.2d 942 (10th Cir.); *Craig v. Champlin Petroleum Co.,* 435 F.2d 933 (10th Cir.). There is nothing in the contract to create a fiduciary duty or confidential relationship. GWS, as mentioned, had no property of the plaintiffs nor was it "handling" property of the plaintiffs.

Special interrogatories were used and the jury was asked to answer on the three basic claims and to assess damages. The jury so found for defendants on the breach of contract claim, as mentioned. It found for plaintiffs on the claim of breach of an implied duty of good faith in the perform-

ance of the contract by GWS, and it found for plaintiffs on the claim of a breach of fiduciary duty.

Before the case went to the jury the parties stipulated that if the jury found for the plaintiffs on more than one claim the court in the entry of judgment would not add the amounts but instead would enter judgment for the largest actual damage figure found by the jury on any claim. The jury awarded actual damages of $11,813,-748 for the plaintiffs on the claim of breach of good faith and $11,459,335 on the fiduciary duty claim. The jury also awarded punitive damages against each defendant.

We have mentioned the disposition which must be made of the fiduciary duty claim. The jury decided the bare contract claim. There remains the claim based on a breach of the duty of good faith implied from the contract. This is the only surviving claim.

The plaintiffs under the good faith claim assert that the sugar was not sold at the best times in the sales year especially during periods of price declines. They also assert that there were delays in the execution of sales decisions imposed by the individual defendants.

■ The trial was necessarily a mixture of evidence on good faith and fiduciary duty. With the fiduciary duty claim excluded as it must be it is not possible to now consider the good faith claim separately. There is an additional problem arising from the trial court's instructions as to the measure of damages to be applied on the good faith claim. This instruction must be held to be in error. It advised the jury that it "may consider, among other things," the profits of GWS in its futures trading in the assessment of damages on the good faith claim. The use of "trading profits" as a factor in such damages introduced an extraneous factor—an erroneous element—in the determination as to what was necessary to place the damaged party in as good a position as he would have been had there been no breach of the implied good faith duty. *A to Z Rental, Inc. v. Wilson,* 413 F.2d 899 (10th Cir.) (applying Colorado law); *Intermountain Rural Electric*

*Ass'n v. Colorado Central Power Co.,* 322 F.2d 516 (10th Cir.).

The trading profits element was advanced as part of the breach of contract claim as to which the jury found against plaintiffs. It was not advanced as part of the implied good faith claim and was in fact no part of it. This was not a breach of fiduciary duty claim where such a special measure may be used. *Wilshire Oil Co. of Texas v. Riffe,* 381 F.2d 646 (10th Cir.); *Page v. Clark,* 197 Colo. 306, 592 P.2d 792.

 In Colorado a definite distinction is made between contract and tort actions. There is no cause of action in tort for the breach of an implied duty under a contract. *Bloomfield Financial Corp. v. Nat'l Home Life,* 734 F.2d 1408 (10th Cir.). Tort recovery was denied in *Davis Cattle Co. v. Great Western Sugar Co.,* 544 F.2d 436 (10th Cir.).

There is an added uncertainty created by the jury in its award of damages. It appears, and both parties seem to acknowledge, that it added damages from the second and third claims. It is not possible to determine the result the jury intended. We pointed out this problem in our prior opinion. 696 F.2d 87. At this late date this uncertainty cannot be resolved on this substantial point by any reference to the original jury. There must be a new trial on the good faith claim.

■ On remand the trial court will have an opportunity to also reexamine the limitations and the pre-judgment interest issues. There exists under Colorado law, which makes a clear distinction between tort and contract claims, no basis for an award of punitive damages in a contract action absent the most egregious circumstances.

The Commodity Exchange Act issue was properly eliminated from the case by the ruling of the trial court.

The trial court permitted prejudgment interest on the basis that it would be permitted under Colorado law for a breach of a fiduciary duty. In view of our holding on the fiduciary duty claim the award of prejudgment interest must be set aside.

■ We hold that at the time the case was commenced the court had jurisdiction. An adjustment of the dollar figures during the proceedings did not divest the court of jurisdiction.

Upon close scrutiny there is nothing to show that the punitive damages claim was not made in good faith under *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845; *Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187 (Colo.).

We conclude that the alter ego determination made as to defendants other than GWS was supported by the evidence.

The case must be remanded for a new trial only on the implied duty of good faith claim in accordance with this opinion. The judgments are set aside and the case is remanded for further proceedings in accordance with this opinion.