**PROFESSIONAL SERVICES GROUP, INC., Plaintiff,**

v.

**CH2M HILL CENTRAL, INC., Defendant.**

No. 83-C-934.

United States District Court, E.D. Wisconsin.

Aug. 2, 1985.

David A. Schaefer, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio and Michael Ash, Godfrey & Kahn, Milwaukee, Wis., for plaintiff.

Ronald L. Wallenfang, Quarles & Brady, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

CURRAN, District Judge.

The present action was commenced on July 26, 1983, invoking the court's diversity jurisdiction. The three count complaint alleges that the defendant breached its contract with the plaintiff, damaging it in the amount of $60,968.00; that such breach caused the plaintiff to under-utilize its capacity, resulting in lost profits of $242,602.50 and that the defendant's conduct constituted a breach of its covenant of good faith, resulting in damages of $303,570.50. Presently before the court are the defendant's motion for summary judgment on all counts and the plaintiff's motion for partial summary judgment on count 1.

## BACKGROUND

On August 3, 1977, the defendant, CH2M Hill, Inc. contracted with the Metropolitan Sewerage District of the County of Milwaukee to provide management and engineering services on a pollution abatement project. This project is an on-going one which may not be completed until the next decade.

An early phase of the project involved a sewer system evaluation survey which was intended to provide CH2M Hill and the Sewerage District with an analysis of the specific deficiencies of the Milwaukee area sewer system. According to the Master Agreement between CH2M Hill and the District, CH2M Hill was authorized to contract with consultants, including Professional Services Group, Inc. (PSG), among others. This $16,000,000 program began in 1978 and was completed in 1981 and utilized up to 250 trained technical personnel provided by the consulting firms.

The contractual relationship between the plaintiff and the defendant is embodied primarily in two documents. The master subconsultant agreement provided the general framework for the legal relationship between the two and Task Order 4–37 specifies the services which the plaintiff was to provide to the defendant on the sewer system evaluation survey. Task Order No. 4–37 provided that the plaintiff was to perform the following services as part of the team effort for the following tasks: organization and coordination, physical survey—manhole inspection and ground water monitoring, physical survey—flow monitoring, physical survey—building inspection, smoke testing, dye water flooding, internal inspection of sewer system and sewer system evaluation survey summary. The Task Order further provided that the workdays of labor to be provided by PSG were 7,078 work days at an estimated direct labor cost of $393,980.00.

In August of 1980, the Program Management Office, which was, according to the contract, responsible for the day-to-day supervision and management of the program, announced that it would begin down staffing by returning 17 people on August 22, 1980 and 18 people on August 29, 1980 to their respective companies. Four PSG personnel were part of this initial reduction. Further reductions were announced in late August and in September. At the time of the initial reductions, PSG had accumulated approximately two-thirds of the 7,078 workdays contemplated by the contract. The court has been unable to ascertain exactly how many workdays were performed by PSG; however, it does appear to be uncontroverted that the actual direct labor performed by PSG totaled $296,645.38 or 75.2% of the $393,980 direct labor cost ceiling.

As the project wound down, it appeared that there were differences between the level of effort reflected in the estimated cost ceilings and the actual work performed by the various consultants. Frank Jenes of CH2M Hill developed a formula for recalculating the fixed dollar profits due under the various associate contracts.

The following table represents the contractual fixed fee with its proposed revision under the Jenes formula:

| Associate | Total Fixed Fee | CH2M Hill's Proposed Revision | Proposed Revision as % of Total Fixed Fee |
|---|---|---|---|
| Zimmerman | $261,573.00 | $251,097.00 | 95.99% |
| Madison | 135,012.00 | 128,790.00 | 95.39% |
| CRS | 64,686.00 | 58,669.00 | 90.69% |
| Howard, Needles | 196,803.00 | 186,478.00 | 94.75% |
| DKI | 90,168.00 | 88,071.00 | 97.67% |
| Linton & Company | 1,355.00 | 1,331.00 | 98.23% |
| Donohue & Associates | 518,392.00 | 486,969.00 | 93.94% |
| Polytech, Inc. | 144,463.00 | 145,339.00 | 100.61% |
| Graef, Anhalt | 302,701.00 | 299,746.00 | 99.02% |
| Globetrotters, Inc. | 88,092.00 | 77,284.00 | 87.73% |
| PSG | 222,977.00 | 161,849.00 | 72.58% |

All of the Associate firms, with the exception of PSG, accepted the revised fee. Although CH2M Hill maintains that PSG refused to negotiate the reduction in the fixed fee, it does appear from the record before the court that negotiations were ongoing from July 1981 until this action was filed on July 27, 1983. These negotiations included a request from PSG that the parties submit to binding arbitration pursuant to Article 7 of the Master Agreement between PSG and CH2M Hill. On its cross motion for summary judgment as to claim 1, PSG argues that it is entitled to the entire fixed dollar profit specified in the contract, whereas CH2M Hill maintains that the proposed revised, fixed dollar profit figure is equitable and that PSG breached the contract by failing to negotiate the figure.

## DISCUSSION

The court finds the following contractual provisions relevant in resolving this controversy.

### AGREEMENT BETWEEN CH2M HILL CENTRAL, INC. AND PROFESSIONAL SERVICES GROUP

ARTICLE 1. PROGRAM MANAGEMENT

A. That, the day-to-day supervision and management of the work called for by the CONTRACT and any and all matters relating thereto shall be the responsibility of the CH2M Program Director, or his delegate.

ARTICLE 3.   SCOPE

A.   That, specific material and services to be provided by the ASSOCIATE under this AGREEMENT will be detailed in Associate Task Orders to be issued from time to time.   Such Associate Task Orders will describe the work to be performed, basis of payment, and time for completion.   Assignments will include work to be accomplished in the ASSOCIATE's office(s) and/or personnel to be assigned to CH2M's PROGRAM office.

B.   That, the ASSOCIATE will not begin work on any of the services of an Associate Task Order until CH2M directs him in writing to proceed.

C.   The ASSOCIATE shall, upon mutual agreement, accept assignments of Associate Task Orders that are within the capability of the ASSOCIATE's staff. These assignments will provide that time allotments and fee arrangements will be consistent with values for this type of work negotiated by CH2M with other ASSOCIATES and the DISTRICT.

ARTICLE 4.   COMPENSATION

A.   As consideration for providing the services enumerated in the individual Associate Task Orders, CH2M shall pay the ASSOCIATE the amount of the ASSOCIATE's Direct Salary expended for each service, plus a percentage of Direct Salary for total Overhead (Salary and General), plus Direct Expenses in connection therewith, plus a Fixed Dollar Profit for each service.

Said payment for each service shall be negotiated by the parties at the time each service is authorized and authorization to proceed shall be in the form of an Associate Task Order specifying the work to be performed, basis of payment and time for completion or the period of time for which the service is to be provided.   Each Associate Task Order shall become a supplement to and part of this AGREEMENT.

On cost plus fixed dollar profit types of fees, the Cost Ceiling represented by Direct Salary, plus Total Overheads (Salary and General) and Direct Expenses shall not be exceeded without a formal amendment of this AGREEMENT.   At such times as the ASSOCIATE determines that the total reimbursable costs for a defined work element will exceed or be significantly less than the Cost Ceiling established, the ASSOCIATE will notify the ENGINEER so that applicable Associate Task Orders can be amended as mutually agreeable to modify the scope of work or to increase the Cost Ceiling. The ASSOCIATE shall continue with any or all parts of the work for which an amended Cost Ceiling is established or a Cost Ceiling overrun is not anticipated.

The Fixed Dollar Profit may not be changed except in the case of an amendment to this AGREEMENT. The change in Fixed Dollar Profit will generally be in proportion to the change in the scope of work.

ARTICLE 7.   REMEDIES

A.   That, all claims, counter-claims, disputes, and other matters in question between CH2M and the ASSOCIATE will be first reviewed by the Consultant Advisory Committee for a recommended solution.   If no solution or resolution is forthcoming, such disputes will be decided by arbitration if the parties mutually agree, or in a court of competent jurisdiction.

*Associate Task Order No. 4–37*

I.   PURPOSE

A.   This section enumerates the services detailed above.

C.   The attached workdays of effort by classification which are attached to the EPA Form 5700–41 referenced in Item B above.   The workdays of labor to be provided by the ASSOCIATE under this Associate Task Order No. 4–37 are 7,078 workdays at an estimated direct labor cost of $393,980.

## IV. COMPENSATION

As consideration for providing the services enumerated in this Associate Task Order, Article II, CH2M shall pay the ASSOCIATE in accordance with the cost plus fixed dollar profit provisions of Article 4 of the Basic Agreement. The Total Overhead Rate (Salary and General) used for this Agreement and indicated on the referenced Form 5700–41 for the ASSOCIATE is the provisional rate of 250.0%. Upon completion of a final audit for any calendar year, a credit or payment may be made to correct the payment for work performed during said calendar year.

The Cost Ceiling for services in this Associate Task Order 4–37 shall be One million eight hundred sixty five thousand two hundred dollars ($1,865,200.).

The Fixed Dollar Profit for such services in this Associate Task Order No. 4–37 shall be Two hundred twenty two thousand nine hundred seventy seven dollars ($222,977.).

The Cost Ceiling and Fixed Dollar Profit above are based on salary and expense levels for completing the services on or before 31 December 1981.

## V. COMPLETION DATE

The work contained in this Associate Task Order shall be completed on or before 12 April 1981.

## VI. AMENDMENTS

This Associate Task Order may be amended as mutually deemed necessary by CH2M and the ASSOCIATE; such amendment shall be made a part of this Associate Task Order.

The issue, as the court sees it, is whether CH2M Hill, given the fact that it was unable to assign all of the workdays contemplated under the Agreement, was justified in lowering the fixed dollar profit amount. I think not, at least not in the manner it elected to do so. It is horn book law that a contract cannot be modified absent the assent of all parties. *See for example Nelson v. Farmers Mutual Automobile Insurance Company*, 4 Wis.2d 36, 54, 90 N.W.2d 123 (1958). Under the terms of the contract the plaintiff agreed to furnish 7,078 workdays, although the direct labor cost was estimated. The cost ceiling was specified, as was the fixed dollar profit. Both contracts contemplated a procedure for modification. Task Order 4, requiring amendments "as mutually deemed necessary" and the Master Agreement specifying that the fixed dollar profit "may not be changed except in the case of an amendment to this Agreement."

■ In this situation PSG committed certain of its personnel to this project which was to, and apparently did, last until spring of 1981. The fact that several of the PSG technicians were dismissed in August and September of 1980 without, at that time, any indication that PSG would not be allowed to provide the contracted for workdays and receive the fixed dollar profit was insufficient to trigger any duty on the part of PSG to attempt to amend the contract. PSG has submitted evidence to the fact that CH2M Hill, on other projects, routinely amended the Task Orders to reflect a change in required workdays. It is also important to recognize that CH2M Hill was in total control of the project. PSG could reasonably have believed that assignments would be given to its men after the initial reduction to fill out the promises made in the contract.

■ If this court were to grant summary judgment to CH2M Hill, it would be tantamount to finding that the contract itself was illusory. PSG would be required to make its people available for over a two year period and to provide over 7,000 workdays unless CH2M Hill decided at the last hour that the men were not needed after all. This is clearly not what the parties intended. If the facts were different and CH2M Hill informed PSG in, for example, April of 1980 that fewer manhours would be required due to a change in the scope of the work, it is entirely possible that I would be constrained to hold, under the contract, that PSG would be required to negotiate a reduction in the fixed dollar profit. But

these were not the facts. CH2M Hill kept PSG dangling and then offered the Jenes formula reduction on a take it or leave it basis. The defendant did not allow PSG to provide the workdays, it did not follow the procedure for amendment and it did not pay PSG the fixed dollar profit. In short, CH2M Hill breached the contract.

CH2M Hill's reliance on *Fattore Company v. Metropolitan Sewerage Commission of the County of Milwaukee*, 454 F.2d 537 (7th Cir.1971), *cert. denied*, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972) is not only misplaced but actually lends support to the plaintiff's position. The Court of Appeals for the Seventh Circuit found that the district court erred in failing to give effect to the "changed circumstances" provision in the contract which would require the defendant to adjust the compensation if it was found that the subsurface in a sewer project materially differed from conditions shown on the defendant's drawings or as indicated in its specifications. I have carefully considered those portions of the contract which recognize or anticipate the possibility of amendment and have found that the defendant failed to follow the agreed upon procedure. To ignore those provisions would be to violate fundamental principles of contract construction. *See, for example, American Motorists Insurance Company v. Trane Company*, 544 F.Supp. 669 (W.D.Wis.1982), *aff'd.*, 718 F.2d 842 (7th Cir.1983).

■ I have, however, reached an opposite conclusion on claims 2 and 3 of the complaint. Claim 2 alleges that the plaintiff, in reliance upon both written and oral representations and agreements, incurred under utilization of capacity and lost profits in the amount of $242,602.50. The plaintiff is here apparently attempting to realize the full amount of compensation which might conceivably have been due him under the direct salary, indirect costs and direct expenses portion of the compensation scheme. The plaintiff argues that had the defendant not misallocated the work, it would have received additional gross profit under those provisions. I can find no pro-

vision in the contract which creates an entitlement on the part of PSG to provide a level of service equal to the cost ceiling provided by the contract. The inescapable fact is that PSG did not incur the costs and is thus not entitled to the profit on them.

Count 3 alleges that the "defendant's conduct constitutes a breach of its implied and/or required covenant of good faith" and seeks damages in the amount of $303,-570.50 which is the sum of the damages sought in the first two counts. Since I have already determined that the plaintiff should prevail on count 1, but not on count 2, I feel that further discussion is unwarranted and the plaintiff's count 3 will be dismissed. Accordingly,

IT IS ORDERED that summary judgment IS GRANTED to the plaintiff on count 1 and to the defendant on counts 2 and 3. Judgment is to be entered in favor of the plaintiff in the amount of $60,968, costs to be borne by the defendant.