Dale A. ERVIN, Mike Wallen, Don R. Plummer, Richard B. Rush, Rodger D. Kruger, Norman Smith, and the Estate of Norman Smith (Daniel T. Smith, Personal Representative), Gregory S. Hearing, Leslie R. Koehnen, Edward J. Cook, Stephen D. Cameron, Richard D. Oneslager, Rodney O. Marshall, John Galli, John L. Weibel, Herbert Hawley, William J. ("Bill") Mattedi, Gerald W. Human, Roger ("Rodger") Scott, Robert H. Schroeder, and the Estate of Robert H. Schroeder (Jeanne Schroeder, Personal Representative), and Samuel W. Geist, Plaintiffs–Appellees and Cross–Appellants,

v.

AMOCO OIL COMPANY, a Maryland corporation, Defendant–Appellant and Cross–Appellee.

No. 92CA1255.

Colorado Court of Appeals, Div. V.

March 31, 1994.

As Modified on Denial of Petition for Rehearing of Plaintiffs–Appellees and Cross–Appellants July 7, 1994.

Petition for Rehearing of Defendant–Appellant and Cross–Appellee Denied July 7, 1994.

Certiorari Granted (Amoco) Dec. 5, 1994.

Cross–Petition for Certiorari Denied Dec. 5, 1994.

 

Hubert M. Safran, Denver, Farrell & La Mantia, Mark A. La Mantia, Rosemont, IL, for plaintiffs-appellees and cross-appellants.

Kirkland & Ellis, Frank Cicero, Jr., John A. Desisto, Denver, William J. Noble, Amoco Corp., Kirkland & Ellis, Richard C. Godfrey, Chicago, IL, for defendant-appellant and cross-appellee.

Opinion by Judge MARQUEZ.

·Defendant, Amoco Oil Company (Amoco), appeals an amended judgment entered on a jury verdict awarding plaintiffs, sixteen current or former Amoco brand retail service station dealers doing business in Colorado (the dealers), over $2.5 million in damages,

pre-judgment interest, and costs for breach of an implied covenant of good faith and fair dealing under certain of the parties' agreements and tortious interference with customer relationships. Although four of the dealers' six claims were dismissed prior to trial, the dealers cross-appeal only a summary judgment entered in favor of Amoco on a claim that it violated § 6–2–101, C.R.S. (1992 Repl.Vol. 2), Colorado's Unfair Practices Act, and an order denying damages for certicare signs on Amoco's capital asset ledger calculations. They do not cross-appeal the jury verdict denying relief on their claim for alleged violation of open price provisions under the Uniform Commercial Code. We affirm.

Here, the dealers entered into written lease agreements and dealer supply agreements with Amoco. Pursuant to the parties' lease agreements, Amoco leases to the dealers the service station properties from which the dealers conduct their business. Under the parties' supply agreements, Amoco sells its motor fuels to the dealers, who resell the fuels to the motoring public.

Both the lease and supply agreements have terms of one to three years. The dealers do not dispute that each dealer periodically executed various documents with Amoco, including the lease and supply agreements. In addition, the dealers do not dispute that these documents each contain integration, cancellation, and merger clauses.

## I.

### Breach of Contract: Implied Covenant of Good Faith and Fair Dealing

In one count of their complaint, the dealers claimed that Amoco breached its contractual obligations under the implied covenant of good faith and fair dealing by abusing its power, acting outside the scope of its discretion, and usurping the benefits of the contract. Relative to this claim for relief, the complaint alleges that, under the agreements, there existed a special relationship and that Amoco had attempted to reserve for itself the discretion to make numerous decisions, including establishing the purchase price for motor fuel, station rentals, station hours, and credit arrangements. At trial,

however, under the court's instructions to the jury, the dealers' damages under this claim were limited to overcharges based upon rental charges for service bays. The dealers presented evidence that they were being charged more than once for the service bays. They prevailed on this claim, and Amoco challenges such result.

### A.

■ Amoco contends that its collection of an unambiguous, expressly agreed upon rent could not constitute a breach of an implied duty of good faith and fair dealing. We conclude that the record supports a finding that the covenant was breached.

■ The covenant of good faith and fair dealing is implied at law in every contract. However, breach of this covenant does not generally give rise to an independent tort claim. *Friedman v. Colorado National Bank*, 825 P.2d 1033 (Colo.App.1991), *rev'd on other grounds*, 846 P.2d 159 (Colo.1993); *Ruff v. Yuma County Transportation Co.*, 690 P.2d 1296 (Colo.App.1984); Restatement (Second) of Contracts § 205 (1981). *See also Larese v. Creamland Dairies, Inc.*, 767 F.2d 716 (10th Cir.1985) (the franchisor-franchisee relationship is one which requires the parties to deal with one another in good faith and in a commercially reasonable manner).

■ In general, this covenant must be tied to a specific contract term that allows for discretion on the part of either party. *See Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873 (5th Cir.1989); *General Aviation v. Cessna Aircraft Co.*, 915 F.2d 1038 (6th Cir.1990); *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359 (Colo.App.1994). Thus, it is most commonly at issue in the performance of requirements or outputs contracts or when a contract contains an open price term or open quantity term.

Here, the lease agreement provided:

Lessee shall pay to Lessor as rent for the Premises, the sum of $___ per month during the term of this Lease unless a variable monthly rental is indicated below. . . .

A subsequent paragraph stated:

Modification of Rental. In the event that the original term of this Lease is for more than one year, each year of said term Lessor reserves the right to modify the monthly rental specified above to conform with Lessor's established policy rental in effect for this type facility as of each anniversary date of the commencement of the term by giving Lessee at least ninety (90) days' advance written notice of such changed rental

. . . . .

Although requiring payment of the actual fixed monthly rental amount is non-discretionary, here, the dealers presented evidence to support the jury verdict including testimony that in addition to being charged a percentage of the value of the land and assets, which purportedly included the value of the service bays, they were charged a separate amount for the service bays. There was also testimony that this calculation method was not explained prior to the start of the present litigation.

Under the evidence presented, a jury could find that such covenant was breached. *Cf. Abbott v. Amoco Oil Co.,* 249 Ill.App.3d 774, 189 Ill.Dec. 88, 619 N.E.2d 789 (1993).

### B.

■ Amoco next asserts that, even if Colorado law recognizes such a good faith covenant, the parties' agreements were fully integrated and contained merger and integration clauses which stated that there were no implied covenants. We disagree.

One provision of the lease agreement reads in pertinent part:

No obligations, agreements or understandings shall be implied from any of the terms and provisions of this Lease, all obligations, agreements and understandings with respect to the subject matter hereof being expressly set forth herein. . . .

Because a covenant of good faith and fair dealing is implied at law in every contract, we conclude that this provision does not preclude recovery here. The jury here could determine only whether plaintiff had proven a rental overcharge based upon the service bay charges, a limitation not inconsistent with the terms of the agreement.

### C.

Amoco next claims that jury instructions regarding the breach of an implied covenant of good faith contain prejudicial legal errors. We disagree.

Initially, we reject Amoco's argument based on grounds discussed in part I.A. above.

### 1.

■ Amoco contends that an instruction incorrectly told the jury that good faith "requires each party to a contract to act in such a manner that each party will attain their reasonable expectations under the contract." We reject this contention.

"Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and *consistency with the justified expectations of the other party.*" Restatement (Second) Contracts § 205 comment a (1981) (emphasis added); *see also Ruff v. Yuma County Transportation Co., supra; Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc., supra.*

### 2.

■ As to another instruction, Amoco contends that it was improper for two reasons. We conclude that neither reason warrants reversal.

The challenged instruction provided as follows:

If you find that Amoco occupies a vastly superior bargaining position, then the implied covenant of good faith and fair dealing is particularly applicable. If you find that is the situation here, then you may enforce the agreements according to what you determine to have been the reasonable expectations of both parties.

### a.

First, as to the contention that this instruction also uses the word "reasonable expectations" and is, therefore, repetitive with

another instruction, we conclude that this argument lacks merit.

The other instruction provides that the reasonable expectations of the parties are used "in determining whether there has been a *breach* of this implied covenant." Conversely, this instruction is concerned with the *remedy* for breach. The *remedy* in such a case is damages which essentially enforces "the agreements according to what [the jury] determine[s] to have been the reasonable expectations of both parties." Thus, these two instructions are not repetitive.

#### b.

■ The other contention involving this instruction is that the statement—"if you find that Amoco occupies a vastly superior bargaining position, then the implied covenant of good faith and fair dealing is particularly applicable"—is inherently misleading, unnecessary, and confusing. We do not find any reversible error.

We conclude that the case law supports the instruction given. *See Larese v. Creamland Dairies, Inc., supra; Triangle Mining Co. v. Stauffer Chemical Co.,* 753 F.2d 734 (9th Cir.1985). Thus, this statement was not inherently misleading, unnecessary, or confusing.

#### 3.

■ Amoco next argues that the following instruction was improper. We disagree.

The challenged instruction provides:

If you find for Amoco on the [Uniform Commercial Code] good faith claim in Count III, you may not award plaintiffs gasoline damages under Count IV, the implied covenant claim. However, even if you find for Amoco on the Uniform Commercial Code good faith claim, you still must determine if Amoco has breached the covenant of good faith and fair dealing. If they [sic] have breached the covenant of good faith and fair dealing, then you must decide whether each plaintiff has proven by preponderance of the evidence a rental overcharge based upon the service bay charges.

#### a.

Amoco contends that the jury should not have been able to use Amoco's internal rent calculations to rewrite the contract's express rental terms—particularly because internally calculated rents differed from the agreed upon contract rents. We disagree.

A financial manager for Amoco testified that the dealers' rents were calculated using the investment value rent program. Under this program, rent was based on a percentage of the fair market value of the land and assets at the station. The dealers claimed that they were being double charged on some assets.

Because the internal rent calculations were relevant to whether there was an overcharge based on the service bay charges, the jury could use this evidence to determine whether there were such overcharges without rewriting contract terms.

#### b.

■ Further, Amoco maintains that the phrase—"a rental overcharge based upon the service bay charges"—improperly told the jury that there were service bay charges and that they constituted "rental overcharges." We disagree.

When the instruction is read as a whole, that phrase has no such impact. The phrase actually narrows the realm of possible damages. Conversely, an open ended instruction would have allowed the jury to assess damages for other rental overcharges or gasoline pricing overcharges.

During deliberations, the jury foreperson asked the court: "Should we decide for a plaintiff on Count IV, are we permitted to allow for damages over and above the bay charges that they claim?" The court stated that the jury "should just consider the service bay charges claimed."

Thus, we do not see how Amoco was prejudiced by this instruction.

### II.

*Tortious Interference with a Business Relationship*

#### A.

■ Amoco next argues that the dealers failed to establish a prima facie case of tor-

tious interference, and thus, as a matter of law, the trial court erred by sending that count to the jury. We disagree.

■ Colorado recognizes the torts of intentional interference with a contractual relationship and intentional interference with a prospective business advantage. *See Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207 (Colo.1984); *Dolton v. Capitol Federal Savings & Loan Ass'n*, 642 P.2d 21 (Colo.App. 1981). These two torts are defined in Restatement (Second) of Torts §§ 766 & 766B (1989), respectively.

■ First, a plaintiff must prove that a defendant intentionally and improperly interfered with the performance of a contract or another's prospective contractual relation. Restatement (Second) of Torts §§ 766 & 766B (1989). "The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." Restatement (Second) of Torts § 767 comment b (1989); *see also Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178 (10th Cir.1989) (whether corporate officer was justified or acted improperly remained a question of fact).

■ Second, "[t]o prove tortious interference with a prospective contractual relationship, it is not necessary to prove an underlying contract." *Dolton v. Capitol Federal Savings & Loan Ass'n, supra*, 642 P.2d at 23. The relationships protected by this rule include any prospective contractual relations "if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with ... the opportunity of selling or buying land or chattels or services." Restatement (Second) of Torts § 766B comment c (1989).

Consistent with Restatement (Second) of Torts § 766B the jury was instructed:

For plaintiffs to prove Count VI they must prove ...

1. Amoco intentionally and improperly interfered with plaintiffs' prospective contractual relations by:

(a) Inducing or otherwise causing actual or potential gasoline customers not to enter into or continue the prospective relationship with the plaintiff, or;

(b) Preventing the plaintiff from acquiring or continuing the prospective relations with actual or potential gasoline customers.

2. Plaintiffs must prove that the alleged improper interference damaged them by impairing their ongoing or prospective contractual relations with actual or potential gasoline customers....

Here, the improper interference alleged by the dealers was that Amoco intentionally increased the dealers' costs and sold products at its company operated stations below what the dealers could profitably match in order to move customers away from the dealers and toward Amoco's company operated stations.

As noted by one dealer:

Well, probably my toughest competitor is Amoco because they're selling the same product that I am, competing for customers that I'm competing for, which they all are, but they're out there pricing their products at or just very close to my buying price. So they're one major competitor.

This dealer also testified to declining sales volumes as evidence that he was losing customers.

Another dealer testified that wholesale costs had risen in the past five years and that, after Amoco started the company operations, "we just can't be competitive at all."

A third dealer testified as follows:

Q: What difference have you observed in the marketplace here in Denver from the early 1980s until today?

. . . .

A: Oh, I think the biggest thing that's changed is that we have now got our oil company as our competitor. Oil company is our competitor, or our landlord, I might say.

Q: They've always been your landlord, but they're the competitor?

A: They're the competitor today, yes.

Q: Are there company-operated locations near you, Mr. Koehnen?

A: Yes.

. . . .

Q: How have you observed those company operations to price their gasoline product on the street?

A: They're pricing very competitively.

Q: Is it your complaint that you want the company operations to sell their gasoline at a higher price?

A: No. I would just like to buy my gasoline at a fair competitive price.

Q: How have you priced your gasoline, Mr. Koehnen, since 1985, 1986?

A: I feel that we've been pricing out of the market because there's no way I can price and be competitive and still cover my overhead.

Q: What effect does that have on your gasoline volume, Mr. Koehnen?

A: My gasoline volume is definitely on the decline.

Other dealers provided similar testimony.

Moreover, an Amoco territory manager for retail contract operations testified that from early 1987, when Amoco had its first retail contract operation (RCO), to 1990, the number of RCOs increased to 35 and that RCOs experienced significant volume gains from 1989 to 1990. He further testified that the RCO purchases no gasoline and pays no maintenance on gasoline equipment, that Amoco pays the retail contract operator a fee, and that in the last three years Amoco had lost more than five dealers.

Conversely, dealers are paid no fees for selling gasoline and are responsible for covering all their own expenses related to gasoline sales. The manager testified that in April 1988, Amoco's dealer buying price jumped approximately 6.8 cents and 8.2 cents a gallon. He acknowledged having complaints that the RCOs at times were selling below a dealer cost and that he had to take action to make sure that did not occur.

■ While competition and an economic interest of seeking to acquire business are not usually improper interference, *see* Restatement (Second) of Torts § 768 (1989), economic pressure may be.

> Economic pressure of various types is a common means of inducing persons not to deal with another, as ... when A increases his prices to B ... The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

Restatement (Second) of Torts § 767 comment c (1989).

Here, under the evidence presented, the determination whether the interference was improper was properly left to the jury, *see Q.E.R., Inc. v. Hickerson, supra,* and we conclude that the evidence presented on these issues was sufficient to sustain the jury's finding of improper interference. *See Cooley v. Big Horn Harvestore Systems, Inc.,* 813 P.2d 736 (Colo.1991) (evidence to be viewed in light most favorable to prevailing party); *Barker v. Colorado Region—Sports Car Club of America, Inc.,* 35 Colo.App. 73, 532 P.2d 372 (1974).

■ Similarly, we conclude it was not necessary that the dealers identify a specific customer relationship or a specific customer. As discussed previously, the dealers' decline in gasoline sales volume was evidence that they were losing customers. This evidence was sufficient to sustain the jury's finding, and therefore, we will not disturb this finding on appeal.

Thus, we conclude that under these circumstances the dealers established a prima facie case of tortious interference with a prospective business relationship.

### B.

#### 1.

Amoco next argues that, as a matter of law, enforcing an express right to collect

rents was neither improper nor tortious conduct. In our view, this argument misstates the issue.

No liability attaches when the act claimed to have caused the improper interference is conduct which the actor has a definite legal right to engage in without qualification. *Radiology Professional Corp. v. Trinidad Area Health Ass'n,* 39 Colo.App. 100, 565 P.2d 952 (Colo.App.1977), *aff'd,* 195 Colo. 253, 577 P.2d 748 (1978); *Caven v. American Federal Savings & Loan Ass'n of Colorado,* 837 F.2d 427 (10th Cir.1988).

Here, the improper interference did not occur in collecting the agreed upon rent. Thus, Amoco's argument fails.

### 2.

Amoco further contends that the trial court wrongly refused to give an "absolute right" and a "privilege" jury instruction. We disagree.

A party is entitled to a jury instruction when the instruction is consistent with existing law and is supported by the evidence. *Federal Insurance Co. v. Public Service Co.,* 194 Colo. 107, 570 P.2d 239 (1977).

For the reasons discussed in part I.A. and II.A., we conclude that the trial court did not abuse its discretion in refusing to give these instructions. While Amoco may have had an absolute right or privilege to bargain in good faith and engage in fair competition, the absolute right that Amoco emphasizes is unrelated to the conduct of which the dealers complain.

### C.

Amoco next contends that an alleged breach of contract cannot render a defendant independently liable in tort. Again, we find that Amoco's focus is too narrow.

The claim is one for tort if an activity or inactivity is not part of a contractual obligation which causes foreseeable injury or harm. *Centennial Square, Ltd. v. Resolution Trust Co.,* 815 P.2d 1002 (Colo.App. 1991).

Initially, we re-emphasize that Colorado recognizes the tort of intentional interference with a prospective business relationship. Thus, some case law Amoco cites, including *Bloomfield Financial Corp. v. National Home Life Assurance Co.,* 734 F.2d 1408 (10th Cir.1984) (no tort claim for breach of implied contractual duties) and *Gilmore v. Ute City Mortgage Co.,* 660 F.Supp. 437 (D.Colo.1986) (no tort claim for negligent loan processing), is not on point.

Moreover, even if bargaining for the rental payment were considered a contractual obligation, economic pressure as discussed in part II.A. is sufficient as an independent ground for tort liability.

### D.

Finally, Amoco contends that a jury instruction relating to intentional interference misstates the law as to what can and cannot constitute compensable "emotional distress" and that the award for emotional distress was not supported by legally competent evidence that such an injury actually occurred or that it was caused by the conduct at issue. We disagree.

Emotional distress is compensable in an action for intentional interference with a contractual relationship if the emotional distress damages are reasonably expected to result. *Westfield Development Co. v. Rifle Investment Associates,* 786 P.2d 1112 (Colo. 1990). An award for such damages will not be disturbed unless it is completely unsupported by the record. *Smith v. Hoyer,* 697 P.2d 761 (Colo.App.1984).

Here, the jury instruction provided:

If you find in favor of a plaintiff or plaintiffs on count VI, you shall award the party actual damages, insofar as their amount has been proven by a preponderance of the evidence, and that were caused by Amoco's intentional interference, an amount which will reasonably compensate the plaintiff for mental or emotional distress, including all highly unpleasant mental reactions resulting from the conduct of Amoco, including reactions such as grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worry.

We see no reason to depart from the above-cited authority and impose a higher threshold of recovery based on principles relating to the law of intentional infliction of emotional distress. Thus, the instruction given was sufficient to inform the jury correctly on the law in Colorado.

Next, testimony—similar to that provided here by the dealers—of sleeplessness, loss of appetite, diarrhea, crying often, and loss of self-esteem have supported claims for mental anguish. *See Smith v. Hoyer, supra; Allabashi v. Lincoln National Sales Corp.,* 824 P.2d 1 (Colo.App.1991). In addition, failure to consult a physician or other professional or to offer expert testimony on this issue does not preclude an award of damages. *Smith v. Hoyer, supra.* Thus, the award was supported by legally competent evidence.

Finally, the instruction here required that the damages "were caused" or "result[ed] from" Amoco's interference. Thus, the instruction satisfied the "reasonably expected to result" requirement.

### III.

Amoco also maintains that several affirmative defenses were established that preclude any judgment for the dealers. We disagree.

### A.

First, we reject Amoco's assertion that the dealers' claims were pre-empted by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq. (1988) (the Act).

The Act was adopted to eliminate the perceived disparity in bargaining power among service station dealers and oil companies, to protect dealers from arbitrary franchise terminations, to provide franchisors with certain rights, and to have a uniform, national body of law in this area. *See* S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, 18, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 874, 877.

The act applies to terminations and non-renewal of franchise relationships, and its provision governing the scope of its preemption provides:

> To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State ... may adopt, enforce, or continue in effect any law or regulation ... with respect to termination (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision is the same as the applicable provision of this chapter.

15 U.S.C. § 2806 (1988).

Here, the dealers do not allege either termination or non-renewal, and thus, we conclude the Act does not apply. Moreover, in order to find preemption, we would have to conclude that the Act is the exclusive remedy for the dealers, or in other words, that the dealers would have to terminate a business relationship, some of more than twenty-five years, and risk everything in order to pursue a remedy for unfair treatment. The plain language of the Act and the policies underlying the Act militate against such a conclusion.

### B.

Amoco also argues that the trial court improperly refused to instruct the jury on the affirmative defenses of ratification and consent, estoppel, and laches. We disagree.

A party is entitled to a jury instruction when the instruction is consistent with existing law and is supported by the evidence. *Federal Insurance Co. v. Public Service Co., supra.*

Moreover, ratification and estoppel are generally good defenses. *See Jones v. Dressel,* 623 P.2d 370 (Colo.1981); *Manor Vail Condominium Ass'n v. Town of Vail,* 199 Colo. 62, 604 P.2d 1168 (1980).

Here, Amoco argued that the dealers could have and should have exercised their rights under the Petroleum Marketing Practices Act. In rejecting this argument, the court noted:

> Because somebody has a chance to bring a lawsuit and gives up that chance so it can

stay in business, not knowing whether he would win that lawsuit or lose that lawsuit, I don't think amounts to ratification and consent, because the testimony is—and I don't think really contested by Amoco—if you don't sign that, that then you're out and have no location and you lose whatever investment you put into the gas station itself. And you maybe can sell some equipment, maybe you can't, but certainly you've lost all goodwill related to that particular location.

Under these facts, the defenses of ratification and estoppel cannot have their usual effect. Moreover, the court did give an instruction concerning whether the dealers voluntarily and intentionally waived their rights to claim a breach of the contract.

In situations such as this in which the dealers are essentially claiming economic duress, the trial court's actions seem particularly appropriate. Thus, we conclude that the court did not abuse its discretion in refusing the tendered instructions. *See Payne v. Russ Vento Chevrolet, Inc.,* 528 P.2d 935 (Colo.App.1974) (not selected for official publication).

### IV.

█ On cross-appeal, the dealers first argue that the trial court erred in granting Amoco's motion for summary judgment on their claims under the Colorado Unfair Practices Act, § 6–2–101, C.R.S. (1992 Repl.Vol. 2). We disagree.

Under this claim, plaintiffs alleged that they were regularly established Amoco-branded service station dealers and that, under their agreement with Amoco, the latter agreed to supply and plaintiffs were required to purchase motor fuel. They further alleged that Amoco operated under a pricing strategy which was contrary to § 6–2–103, C.R.S. (1992 Repl.Vol. 2), that the pricing strategy discriminated against plaintiffs as opposed to company-operated facilities, and that it was not imposed in good faith. Under this claim, plaintiffs sought injunctive relief and treble damages.

The court granted summary judgment dismissing this claim on grounds that the Act required that a seller have two different places of business and sell at a lower price in one place than another.

Section 6–2–103(1), C.R.S. (1992 Repl.Vol. 2) provides in pertinent part at follows:

It is unlawful for any person, firm, or corporation ... engaged in the production, manufacture, distribution, or sale of any commodity, product, or service ... with the intent to destroy the competition of any regular established dealer in such commodity, product, or service or to prevent the competition of any person, firm, private corporation ... to discriminate between different sections, communities, or cities, or portions thereof, or between different locations in such sections, communities, cities, or portions thereof ... by selling or furnishing a commodity, product, or service at a lower rate in one · section, community, or city, or any portion thereof, than in another....

Although a business need not have two addresses before the Act will apply, *see Dunlap v. Colorado Springs Cablevision,* 855 P.2d 6 (Colo.App.1992), the court found that the undisputed facts show that there is no locality discrimination in this case.

We conclude that the court did not err in this ruling and that its finding is supported by the record. *See Dunlap v. Colorado Springs Cablevision, Inc.,* 829 P.2d 1286 (Colo.1992).

█ Last, the dealers contend that the trial court erred in denying their damages claim for the cost of certicare signs included on Amoco's capital asset ledger calculation. However, the dealers must do more than merely assert error in a vague and unexplained fashion. *See Committee For Better Health Care v. Meyer,* 830 P.2d 884 (Colo. 1992). Thus, we deny this claim without addressing its merits.

The judgment is affirmed.

JONES and DAVIDSON, JJ., concur.