Donald W. NUTTING, an individual doing business as Foothills Distributing Co., Plaintiff,

v.

RAM SOUTHWEST, INC., a New Mexico corporation doing business as Violets; and Ron Sheppeard, an individual, Defendants.

No. CIV. A. 98–B–2360.

United States District Court, D. Colorado.

July 10, 2000.

Brian D. Smith, Brian D. Smith, P.C., Denver, CO, for plaintiff.

C. Michael Montgomery, Sharra Lee Ikari, Montgomery,Kolodny, Amatuzio, Dusbabek & Parker, LLP, Denver, CO, Kurt S. Lewis, Webb & Lewis, LLC, Denver, CO, Paul Adams, Jeffrey D. Myers, Rod D. Baker, Peacock, Myers & Adams, P.C., Albuquerque, NM, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Plaintiff, Donald Nutting ("Nutting"), asserts claims for direct infringement of United States Patent No. 5,547,381 ("'381 patent"), inducing infringement of the '381 patent, deceptive trade practices, and breach of a non-competition contract against Defendants, RAM Southwest, Inc. ("RAM") and Ron Sheppeard ("Sheppeard") (collectively "Defendants"). Defendants assert counterclaims for "interference with business and contractual relations" and deceptive trade practices. Defendants move for summary judgment on Mr. Nutting's claim of breach of the non-competition agreement. Mr. Nutting cross-moves for summary judgment on the Defendants' counterclaims. Oral argument would not aid my resolution of these matters. Having the benefit of the briefs to construe properly the claims in question, and for the following reasons, I grant Defendants' motion for summary judgment as to the non-competition agreement, and grant Mr. Nutting's motion for summary judgement as to Defendants' counterclaims. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1338.

## I. Background

The following facts are undisputed. Mr. Nutting and Mr. Sheppeard sell and manufacture artificial vampire fangs. In 1994, the two met at a Halloween trade show where Mr. Nutting was demonstrating a new, longer fang product called "Custom Dracula Fangs." The Sheppeards (Mr. Sheppeard and his wife, co-owners and officers of RAM, doing business as Violet's Costumes) have manufactured and sold fangs since 1988. They developed an earlier product called "Original Fangtastics." Mr. Sheppeard and Mr. Nutting entered into a relationship whereby the Sheppeards would distribute Mr. Nutting's Custom Dracula Fangs. They also signed a non-competition agreement. In his complaint, Mr. Nutting alleges that Mr. Sheppeard violated the non-competition agreement and packaged his competing fangs in a coffin-shaped display box similar to that used for the Custom Dracula Fangs.

The distributor relationship deteriorated for these and other reasons. The Sheppeards later developed their own fang product in 1995 named "Professional Fangtastics," a derivation of their "Original Fangtastics" product. On March 22, 1994, Mr. Nutting applied for a patent for his Custom Dracula Fangs. Patent issued on August 20, 1996 as the '381 Patent.

The '381 Patent describes an "artificial and removable tooth cap body and a method of easily attaching the tooth cap body to a real tooth." ('381 Patent, Abstract). It explains that,

> [i]n the course of parties, particularly Halloween parties, it is common to have people masquerade as vampires and other wild beasts. In doing so, these people are faced with the problem of using tooth cap bodies that simulate fangs.... [T]here is always the problem of the tooth cap body falling out, causing the masquerader the embarrassment of losing virility as to the character he or she is performing.

('381 Patent, Col. 1 lines 10–18). The '381 Patent purports to address these insufficiencies by providing a superior method of securely anchoring the tooth cap to a real tooth so "the tooth cap body does not fall out prematurely." ('381 Patent, Col. 1 lines 22–25). A fang user places the thermoplastic (malleable/hardenable) material into the cavity of the tooth cap. Before the material hardens the user stretches the material across his or her surrounding teeth, pressing and shaping the material with his or her fingers to anchor it to adjacent teeth. ('381 Patent, Col. 2 lines 23–31). After the thermoplastic material hardens, the user can remove the fang and re-use it "many times over." ('381 Patent, Col. 2 lines 40–45).

## II. Summary Judgment Standards

The purpose of a summary judgment motion is to assess whether trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Rule 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The non-moving party has the burden of showing that issues of undetermined material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. Rule

56(e); *see also Otteson v. United States*, 622 F.2d 516, 519 (10th Cir.1980). These facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Mares*, 971 F.2d at 494. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *White*, 45 F.3d at 360 (citations omitted), as are conclusory assertions that factual disputes exist. *See Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. Evidence presented must be based on more than "mere speculation, conjecture, or surmise" to defeat a motion for summary judgment. *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir.1999); *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1163 (10th Cir.1999). Nevertheless, summary judgment is inappropriate if disputes remain as to material facts. *See James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 124 F.3d 1321, 1323 (10th Cir.1997).

## III. Breach of the Non-Compete Agreement

In support of their motion for summary judgment on Mr. Nutting's claim for

breach of the non-competition agreement Defendants argue that: (1) the agreement is invalid as a naked restraint on competition that fails to protect a legally cognizable interest and, as such, is void against public policy; (2) the scope of the restraint embodied in the agreement goes beyond any protectable interest; (3) the agreement lacked consideration; and (4) Mr. Nutting is barred from bringing this claim under the doctrine of "estoppel by laches." I hold that the non-competition agreement is void as a matter of law upon propositions one and two. Consequently, I need not address Defendants' third and fourth arguments.

## A. Legally Protectable Interests

Defendants argue that the non-competition agreement is invalid as a naked restraint on competition not ancillary to any other agreement or relationship between the Mr. Nutting and the Defendants. They assert that the agreement protects no legally cognizable interest and is therefore a violation of Colorado public policy. They ask me to apply Colo.Rev.Stat. § 8–2–113 to determine the acceptable boundaries of the non-competition agreement. Mr. Nutting responds that: (1) Colo.Rev.Stat. § 8–2–113 applies to employment contracts only and the instant agreement does not fall within its scope; and (2) the case of *Universal Gym* should control.

Colorado law embodies a strong public policy which disfavors covenants not to compete, protecting employees "from non-competition clauses except in carefully defined circumstances." *Colorado Accounting Machines, Inc. v. Mergenthaler*, 44 Colo.App. 155, 609 P.2d 1125, 1126 (1980). This public policy is embodied in Colo. Rev. Stat. § 8–2–113, which limits non-competition agreements to narrowly defined circumstances. Although the statute is included in Title 8, the Labor and Industry section, it has been held to apply outside of a strict employment context. *See Smith v. Sellers*, 747 P.2d 15 (Colo.Ct.App. 1987) (independent contractors); *Gold*

*Messenger, Inc. v. McGuay*, 937 P.2d 907 (Colo.Ct.App.1997) (franchiser/ franchisee relationships).

Mr. Nutting recognizes that Colorado has extended this statute beyond employment agreements. He argues though that the Colorado courts only apply this statute to what are, at their core, still employment relationships. Thus, he says *Smith* is distinguishable. I disagree.

The defendant in *Smith* was a dentist who entered into an agreement to associate with a pre-existing dental office. He handled his own billing, bookkeeping, insurance, taxes, benefits, laboratory, and administrative expenses. He paid Plaintiff 50% of the value of his services. In return he received use of the dental office when Plaintiff was not there. In *Smith* the covenant specifically stated that the parties were not in an employer/ employee or agency relationship "for any purposes." This arrangement was clearly not an employment relationship by intent or design, yet the Colorado Court of Appeals applied Colo.Rev.Stat. § 8–2–113.

■ Here there also was clearly no employee/ employer relationship. However, there was, at some point, a distributor/ manufacturer relationship. Mr. Nutting provided Defendants with a product that Mr. Sheppeard then resold to retailers. The parties entered into a self-titled "Non–Competition Agreement." The agreement recited that Defendants "agrees [sic] not to take any elements of the product on their own, and go into competition against Foothills Distributing with a product of their own manufacture that contains any of these elements of Dracula Fangs [TM]. This agreement has no effect upon the product that Violet's Costumes already manufactures called Fangtastics." Defendants' Exhibit A to Motion for Summary Judgment. It is undisputed that the Defendants were already in the business of selling fangs and fangs made up a significant portion of that business. While this agreement did not completely limit the Defendants' ability to make a

living at their chosen trade, it did limit their ability to make and market a product with the unspecified "elements" of Dracula Fangs, whether or not the '381 patent would have covered those elements. I therefore conclude that Colo. Rev. Stat. § 8–2–113 applies to the "Non–Competition Agreement."

Mr. Nutting relies on *Universal Gym Equipment, Inc., v. Atlantic Health & Fitness Products,* 229 U.S.P.Q. 335 (D.Md. 1985), *aff'd in part,* 827 F.2d 1542 (Fed. Cir.1987). *Universal Gym* involved a contract clause in a licensing agreement. The Plaintiff there agreed to license exercise equipment to the Defendant, in return for a promise that the equipment's specific features, designs, technical information, as well as Plaintiff's know-how would be kept confidential and not appropriated by the Defendant after the end of the contract. The District Court found that the Defendant breached the contract by making its own machine after the contract ended incorporating features of the Plaintiff's machine, despite the fact that this information may have been available in either the market place or through reverse engineering. Mr. Nutting points particularly to language in the case that supports the ability of a company to "protect one's features and designs by contract, even if they are not trade secrets," *Universal Gym,* 229 U.S.P.Q. at 346, and the fact that the contract at issue here allowed the Defendants to "compete as vigorously as they desire in this market,—but with their own products." *Id.*

Mr. Nutting is correct that *Universal Gym* bears some similarity to this case. Like the Plaintiff in *Universal Gym,* Mr. Nutting attempted to prevent others from copying his product. However, *Universal Gym* is distinguishable.

First, the contract in *Universal Gym* was primarily a licensing arrangement. Unlike the agreement here, it was not titled "Non–Competition Agreement," but rather contained one section intended to limit the Defendant's use of the licensed material both during and after the licensing arrangement. Second, the contract in *Universal Gym* was sufficiently particular to put the Defendants on notice regarding what material was prohibited, and did not just bar use of "elements." Finally, and most importantly, in *Universal Gym* the court was not faced with a clear legislative policy against such clauses. Moreover, the United States District Court for the District of Maryland applied California contract law, which had no statute similar to Colo.Rev.Stat. § 8–2–113. Instead, the court was able to look at the variety of covenants not to compete addressed by California law and determine where the Universal Gym contract fell in the spectrum. Similarly, case law in California allowed for the protection of trade secrets by contract, regardless of whether the trade secret met a definition similar to the statute in Colorado. *See* part B, *infra;* Colo.Rev.Stat. § 7–74–102(4).

■ The issue, then, is whether the agreement here falls into one of the narrowly defined categories of acceptable non-competition contracts under Colorado law. The statute states in relevant part:

"Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:

(a) Any contract for the purchase or sale of a business or the assets of a business;

(b) Any contract for the protection of trade secrets;

(c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;

(d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel."

A covenant that fails to meet one of the exceptions defined in the statute "is facially void, rather than voidable ....." *Management Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo.Ct.App. 1988).

Clearly, sections (c) and (d) are not applicable. I conclude that sections (a) and (b) don't apply either.

Section (a) allows parties to enter into a non-competition agreement in conjunction with the purchase or sale of a business. The purpose of the exception is to protect the good will of the business being sold. *DBA Enters., Inc. v. Findlay*, 923 P.2d 298 (Colo.Ct.App.1996). This exception has been applied to transfer of business assets from husband to wife as part of a divorce proceeding, *In re Marriage of Fischer*, 834 P.2d 270, 273 (Colo.Ct.App.1992), to a covenant executed by a partner in a new business for the benefit of an investor contributing substantial funds for the business, *Harrison v. Albright*, 40 Colo.App. 227, 577 P.2d 302, 304–05 (1977), and to a covenant in an employment contract coupled with a corporate buy-sell agreement, *Boulder Medical Ctr. v. Moore*, 651 P.2d 464 (Colo.Ct.App.1982). Again, these cases are all distinguishable.

Section (b) allows parties to enter into non-competition contracts to protect a trade secret. Of course, any information Mr. Nutting wished to protect under this section must be a trade secret. *Porter Indus. v. Higgins*, 680 P.2d 1339 (Colo.Ct. App.1984). What constitutes a trade secret is generally a question of fact. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 848 (10th Cir.1993). Colorado has adopted the Uniform Trade Secrets Act, which defines trade secret as "any scientific or technical information, design, process, procedure, formula, [or] improvement ...." Colo.Rev.Stat. § 7–74–102 (1997). The following factors are considered in determining whether certain information is a trade secret:

(1) the extent to which the information is known outside the business;

(2) the extent to which the information is known to those inside the business;

(3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

(4) the savings effected and the value to the holder in having the information as against competitors;

(5) the amount of effort or money expended in obtaining and developing the information; and

(6) the amount of time and expense it would take for other to acquire and duplicate the information.

*See* CATHY STRICKLIN KRENDALL, COLORADO METHODS OF PRACTICE § 19.25 (4th ed.1997) (citing cases).

Additionally, the owner of any trade secret "must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner ...." *Id.* § 7–74–102(4). Such precautions must be more than normal business procedures. *Colorado Supply Co. Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo.Ct.App. 1990). Such efforts may include advising employees of the existence of a trade secret, limiting access to a need to know basis, and controlling access to locations where the information may be learned. CATHY STRICKLIN KRENDALL, COLORADO METHODS OF PRACTICE § 19.25 (4th ed.1997) (citing cases).

There is no genuine dispute that the subject of the parties' agreement is not a trade secret. Section (b) does not save this contract.

*B. The Scope of the Restraint*

■ Even assuming that Colo.Rev.Stat. § 8–2–113 does not apply to this agreement, or that § 8–2–113 applies but the agreement falls into one of the enumerated exceptions, this agreement would still fail because of its unreasonable duration and scope.

Any non-competition agreement must be reasonable as to both duration and scope.

*See, e.g., Sprague's Aetna Trailer Sales, Inc. v. Hruz,* 172 Colo. 469, 474 P.2d 216, 217–18 (1970); *Rivendell Forest Products, Ltd. v. Georgia–Pacific Corp.,* 824 F.Supp. 961, 969 (D.Colo.1993); *Zeff, Farrington & Associates, Inc. v. Farrington,* 168 Colo. 48, 449 P.2d 813 (1969). There is no general rule regarding what is "reasonable" in such contracts. Rather each case must be examined on its own facts. *Zeff,* 168 Colo. 48, 449 P.2d 813.

There appears to be no reported decision in which a Colorado court has stricken a time limitation as being unreasonable. *See Axelson v. Columbine Laundry Co.,* 81 Colo. 254, 254 P. 990 (1927) (six month provision held enforceable); *Weber v. Nonpareil Baking Co.,* 85 Colo. 232, 274 P. 932 (1929) (perpetual covenant held enforceable). Similarly, the Colorado courts take an *ad hoc* approach to whether a geographic scope provision is "reasonable." Colorado courts have enforced a range of provisions, from county-wide restrictions, *Gibson v. Angros,* 30 Colo.App. 95, 491 P.2d 87 (1971), to nation-wide restrictions. *Trans–American Collections, Inc. v. Continental Account Servicing House, Inc.,* 342 F.Supp. 1303 (D.Utah 1972) (applying Colorado law). No Colorado case has addressed the issue of a world-wide restriction.

Defendants argue that the scope of the restraint here is impermissible, both as to time and geography. As Mr. Nutting conceded in deposition:

Q. So it was your understanding that after Mr. Sheppeard signed the agreement, he would never be able at any time in the future at any place in the world to sell a product known as Dracula Fangs having the elements as you earlier described?

A. Yeah.

Mr. Nutting does not dispute that the agreement is world-wide and perpetual. However, he argues that the agreement is nonetheless reasonable because any restraint is limited to one product. I disagree.

As to duration, Mr. Nutting offers no evidence that a perpetual restriction was required in order to protect himself and his product. Although the Colorado Supreme Court has upheld a perpetual covenant, *Weber v. Nonpareil Baking Co.,* 85 Colo. 232, 274 P. 932 (1929), that covenant was limited to competition within one county in Colorado. Here, the agreement was not limited in any way, except that Mr. Sheppeard could not sell "a product of [his] own manufacture that contains any of these elements of Dracula Fangs." This phrase is too vague to act as any real limitation on the covenant. It does not make clear what "elements" Mr. Sheppeard was prevented from using, or whether Mr. Sheppeard could incorporate any of the Dracula Fang elements, for instance the bonding agent, into a non-fang product.

Similarly, as to geographic scope, Mr. Nutting offers no evidence that he required a world-wide restriction in order to protect his niche in the market. At the time agreement was entered into, Mr. Nutting had taken some orders at a trade show, but there is no allegation that his business was world-wide. Additionally, there is no allegation that Dracula Fangs were ever sold in any country outside the United States.

I therefore hold that the Non–Competition Agreement was unduly broad, both as to time and geographic scope, and is thus void.

## IV. Defendants' Counterclaims

Defendants assert two counterclaims: (1) interference with business and contractual relations; and (2) deceptive trade practices. Defendants allege that Mr. Nutting interfered with their business and contractual relations by posting a patent infringement warning sign at the 1996 trade show, initiating this suit, and publicizing this suit. They argue these actions resulted in loss or damage. They further allege that Mr. Nutting engaged in deceptive trade practices by disparaging their

goods and services through false and misleading representations of fact, resulting in actual damages. Mr. Nutting moves for summary judgment on these claims, arguing that there is no evidence to support either. For the reasons set forth below, I agree.

### A. Interference with Business or Contractual Relations

Defendants have titled their claim "Interference with Business and Contractual Relations." Colorado recognizes two distinct torts relating to interference with a business relationship: intentional interference with contract and interference with a prospective business advantage. As to intentional interference with contract:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*See Q.E.R., Inc. v. Hickerson,* 880 F.2d 1178, 1183 (10th Cir.1989); *Memorial Gardens v. Olympian Sales & Management Consultants, Inc.,* 690 P.2d 207, 210 (Colo. 1984); RESTATEMENT (SECOND) OF TORTS, § 766. To succeed on a claim for intentional interference with existing contractual relations, of course, one must plead and prove a valid contract with a third party. *See Fasing v. LaFond,* 944 P.2d 608, 612–13 (Colo.Ct.App.1997); *Grimm Const. Co., Inc. v. Denver Bd. of Water Com'rs,* 835 P.2d 599, 601 (Colo.Ct.App.1992). Next, one must show that the other party intentionally and improperly interfered with that contract, causing the third party not to perform the contract, and causing the claimant to suffer damages as a result. *See Q.E.R.,* 880 F.2d at 1183; *Memorial Gardens,* 690 P.2d at 210.

Both intentional interference with contract and interference with a prospective business advantage require intentional and improper conduct, but interference with a prospective business advantage does not require a current contract. *See Dolton v. Capitol Federal Savings & Loan Ass'n,* 642 P.2d 21, 23 (Colo.Ct.App.1981) (citing RESTATEMENT (SECOND) OF TORTS § 766B); *Montgomery Ward & Co. Inc. v. Andrews,* 736 P.2d 40, 47 (Colo.Ct.App.1987). It is undisputed that the element of contract is missing from this claim. Therefore, I construe it as a claim for interference with a prospective business advantage. Accordingly I apply Rule 56 to this claim as construed.

As to this tort:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

*Dolton,* 642 P.2d at 23; *Amoco Oil Co. v. Ervin,* 908 P.2d 493 (Colo.1995).

The term "contractual relations" is not used in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation. *See* RESTATEMENT (SECOND) OF TORTS §§ 766B cmt. c (1979).

In determining whether the interference is improper, I must consider:

> (1) the nature of the Defendants' conduct;
>
> (2) the defendant's motive;
>
> (3) the interests of the plaintiff with which the defendant's conduct interferes;

(4) the interests sought to be advanced by the defendant;

(5) the social interests in protecting the freedom of action of the defendant and contractual interests of the plaintiff;

(6) the promximity or remoteness of the defendant's conduct to the interference; and

(7) the relations between the parties.

RESTATEMENT (SECOND) OF TORTS §§ 767 (1979); *See also Westfield Development Co. v. Rifle Inv. Associates,* 786 P.2d 1112, 1117–18 (Colo.1990); *Trimble v. City and County of Denver,* 697 P.2d 716 (Colo. 1985). " 'The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.' " *Ervin v. Amoco Oil Co.,* 885 P.2d 246, 253 (Colo.App. 1994), *aff'd in part, rev'd in part,* 908 P.2d 493 (Colo.1995) (citing RESTATEMENT (SECOND) OF TORTS §§ 767 comment b); *see also Q.E.R., Inc. v. Hickerson,* 880 F.2d 1178 (10th Cir.1989) (whether corporate officer was justified or acted improperly remained a question of fact). The weight carried by these factors may vary considerably, and the determination of whether the interference is improper may also vary. *See* RESTATEMENT (SECOND) OF TORTS §§ 767 (1979).

Additionally, there is a safe harbor provision for business competition, including interference with existing or prospective business relations, when the nature of the relationship being interfered with is at will. Section 768 provides:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will. RESTATEMENT (SECOND) OF TORTS §§ 768.

"Wrongful means" is defined as "predatory means ... physical violence, fraud, civil suits and criminal prosecutions." RESTATEMENT (SECOND) OF TORTS §§ 768 cmt. e (1979); *see also* WILLIAM H. PROSSER, ET AL., PROSSER AND KEATON ON THE LAW OF TORTS §§ 130, at 1013 (5th ed.1984) (discussing various competitive means a defendant may employ without incurring liability). An "actor may use persuasion and he [or she] may exert limited economic pressure" without engaging in wrongful means. The rule stated in section 768 "rests on the belief that competition is a necessary or desirable incident of free enterprise." RESTATEMENT (SECOND) OF TORTS §§ 768 cmt. e (1979).

 Defendants point to three acts by Mr. Nutting that they believe were intentional and improper: (1) the warning posted by Mr. Nutting at the March 1996 trade show indicating his belief that his pending patent was being infringed and his intent to take legal action against perpetrators of that infringement; (2) the bringing of the current suit; and (3) the publicity surrounding the suit. They argue that as a result of these acts, Spencer Gifts stopped buying product from Defendants. Mr. Nutting argues that: (1) although he displayed a sign at the 1996 trade show, the sign was proper and Spencer Gifts continued to buy product from the Defendants until September of 1998; (2) there is no

evidence that the bringing of the current suit was for any improper purpose; and (3) there is no evidence that Mr. Nutting instigated the publicity surrounding this suit. I agree with Mr. Nutting.

Defendants second and third points may be disposed of quickly. Defendants admit that "standing alone the infringement suit may not constitute improper means as that term is used in the Restatement." Defendants present no evidence that this suit was brought for illegitimate purposes or was not based on a colorable claim. Defendants also admit that "[t]he record is thus far unclear as to Mr. Nutting's other means of interfering, the publicity surrounding the lawsuit. It is not clear that Mr. Nutting initiated the publicity ...." Again, the Defendants present no evidence that Mr. Nutting in any way instigated publicity surrounding this suit.

Thus, the only issue is whether the sign displayed by Mr. Nutting at the March 1996 trade show is sufficient to show a genuine issue that he interfered intentionally with Defendants' prospective business advantage. First, the sign is insufficient as a matter of law to sustain this claim. I further conclude Defendants fail to meet their Rule 56 burden to present any evidence that the sign induced or otherwise caused Spencer Gifts not to enter into or continue business relations with them.

The parties do not disagree about the sign. In large capital letters across the top it says "WARNING." In smaller capitals the next line reads "PATENT INFRINGEMENT." The sign then goes on to state:

It has come to our attention that several companies are attempting to copy our Custom Dracula Fangs ™. Foothills, Ltd.'s thermoplastic method of fang attachment is patent pending and a patent is expected to be granted this year. At the time of patent issue, we will pursue all legal remedies against every manufacturer, distributor, and retailer who carries infringing copies, and we will seek penalties, fines, and damages up to the maximum legal limit allowable under law for infringement of our patent.

*ALSO;*

Retailers and Distributors should be aware that it takes a special kind of low-temperature thermoplastic to successfully work the fang attachment. Foothills, Ltd. has spent considerable time and money to formulate a low-temperature thermoplastic that works *just right* for fang attachment. If these copies of our fang attachment do not contain such specially formulated thermoplastic, customers who buy these copies will be subjected to the possibility of partial plates that are hard to make, and fangs that easily fall out. Plaintiff's Exhibit 6.

The sign ends with the address and phone number of Mr. Nutting's company, Foothills, Ltd. It is undisputed that this sign was displayed at the March 1996 trade show in Chicago, and that the sign was in Mr. Nutting's booth for five or six days. *See* Nutting Depn. at 181–82.

In order prevail on this claim, the Defendants must come forward with evidence showing the existence of a genuine factual issue as to whether the sign was intentional, improper, and caused a third person not to enter into or continue a prospective relation in a way that resulted in pecuniary harm. Defendants argue that the sign operated as threat to potential customers and was improper because the patent had not yet issued. They further argue that it led to a termination of business between Spencer Gifts and Defendants. As evidence of this termination they offer the deposition testimony of Louis Klaitman, president of Looking Glass, Inc., the Defendants' retail representative. Mr. Klaitman served as a broker between Defendants and Spencer Gifts. Mr. Klaitman has worked with Spencer for over twenty years. *See* Klaitman Depn. at 20. He attended the 1996 trade show in question, and called on Spencer Gifts in the three years following that show. He testified that Spencer bought products from Defen-

dants in the amount of $17,262.72 in 1996, $14,385.60 in 1997, and $16,860.48 in 1998. *See id.* at 50. The last order was on September 15, 1998. *Id.* at 38.

Defendants' argue that Spencer Gifts "discontinued doing business with Defendants immediately after the patent warning was posted and the suit resulted in national negative publicity." Defendants Opposition to Motion for Summary Judgment at 10. However, the deposition testimony they present fails to support this statement. Mr. Klaitman testified that Spencer continued to do business with Defendants for two and one-half years following the patent infringement warning sign at the 1996 trade show. Their evidence does raise a question whether the national publicity played a part in Spencer Gifts' discontinuation of the Defendants' product. However, Defendants have failed to provide any evidence that links that publicity in any way to an improper act of Mr. Nutting. Mr. Klaitman's opinion is speculative at best. *See Rice v. United States,* 166 F.3d 1088, 1092 (10th Cir.1999); *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1163 (10th Cir.1999). I conclude no reasonable juror could find for Defendants on their counterclaim for interference with business and contractual relations.

## B. Deceptive Trade Practices

"(1) A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person: ... (h) Disparages the goods, services, property, or business of another by false or misleading representation of fact ...." Colo. Rev. Stat. § 6–1–105.

■ Defendants argue only that Mr. Nutting disparaged their fangs by exhibiting the 1996 trade show patent infringement warning. They point to the language in the sign that: "If these copies of our fang attachment do not contain such specially formulated thermoplastic, customers who buy these copies will be subjected to the possibility of partial plates that are hard to make, and fangs that easily fall out." Plaintiff's Exhibit 6. Defendants argue that this quotation was derogatory to their product and that Mr. Klaitman understood when he saw the sign that it was referring to their product. Defendants Opposition to Motion for Summary Judgment at 6. Mr. Nutting argues that this sign simply represents the opinion of a competitor.

Mr. Klaitman testified at deposition:

Q: Do you remember ever seeing a sign up in Mr. Nutting's area?

A: Yes.

Q: What do you remember about that sign?

A: Not a lot, to be honest with you, other than it was something about he, he was the original or something Fangtastics.

It just, it just brought something about the Fangs or Fangtastics, about his product. I don't remember the thing. I didn't write it down ....

Q: So you don't remember what it said?

A: It was something derogatory about Fangtastics as far as I was concerned, you know, but I don't remember exactly the wording, or his ownership or something. I don't know.

Q: Do you remember specifically that the sign named Fangtastics in it?

A: I can't honestly say that.

Q: So you don't recall whether it—

A: No.

Q: —actually named Violets?

A: No.

Q: Ron Sheppeard?

A: No.

Q: Or Fangtastics?

A: No. I can't recall that honestly .... Klaitman Depn. at 29–31

He was later asked:

Q: Okay. You never talked to Mr. Nutting about it at all?

A: Nope.

Q: So did you just assume it had to do with Fangtastics, or Violets, or Professional Fangtastics?

A: I would assume that, yes .... Klaitman Depn. at 32

Defendants fail to present any competent evidence that Mr. Nutting was referring to their fangs. Mr. Klaitman's speculation will not suffice to defeat a Rule 56 motion. *Rice v. United States,* 166 F.3d 1088, 1092 (10th Cir.1999); *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1163 (10th Cir.1999). Defendants also fail to show any evidence that the statement "these copies of our fang attachment do not contain such specially formulated thermoplastic, customers who buy these copies will be subjected to the possibility of partial plates that are hard to make, and fangs that easily fall out," Plaintiff's Exhibit 6, is a false or misleading representation of fact. For these reasons, I grant Mr. Nutting's motion for summary judgment on Defendants' counterclaim for deceptive trade practices.

Accordingly, IT IS ORDERED that:

1. Defendants motion for summary judgment on breach of the non-competition agreement is GRANTED, and this claim is DISMISSED;

2. Mr. Nutting's motion for summary judgment on Defendants' counterclaims is GRANTED. Defendants' counterclaims are DISMISSED.